JAPAN WHALING ASSOCIATION ET AL. *v.* AMERICAN
CETACEAN SOCIETY ET AL.

No. 85–954.   Argued April 30, 1986—Decided June 30, 1986*

---

*Together with No. 85–955, *Baldrige, Secretary of Commerce, et al.* v.
*American Cetacean Society et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, STEVENS, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and REHNQUIST, JJ., joined, *post*, p. 241.

*Associate Attorney General Burns* argued the cause for petitioners in No. 85–955. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Peter R. Steenland, Jr., Donald A. Carr, Dianne H. Kelly,* and *Abraham D. Sofaer. Scott C. Whitney* argued the cause for petitioners in No. 85–954. With him on the briefs were *Steven R. Perles* and *William H. Allen.*

*William D. Rogers* argued the cause for respondents in both cases. With him on the brief were *James A. Beat* and *Donald T. Hornstein.*†

JUSTICE WHITE delivered the opinion of the Court.

In these cases, we address the question whether, under what are referred to in these cases as the Pelly and Packwood Amendments, 85 Stat. 786, as amended, 22 U. S. C. § 1978; 90 Stat. 337, as amended, 16 U. S. C. § 1821 (1982 ed. and Supp. III), the Secretary of Commerce is required to certify that Japan's whaling practices "diminish the effectiveness" of the International Convention for the Regulation of Whaling because that country's annual harvest exceeds quotas established under the Convention.

---

†*Steven R. Ross, Charles Tiefer,* and *Michael L. Murray* filed a brief for the Speaker of the House of Representatives et al. as *amici curiae* urging affirmance.

224

I

For centuries, men have hunted whales in order to obtain both food and oil, which, in turn, can be processed into a myriad of other products. Although at one time a harrowing and perilous profession, modern technological innovations have transformed whaling into a routine form of commercial fishing, and have allowed for a multifold increase in whale harvests worldwide.

Based on concern over the effects of excessive whaling, 15 nations formed the International Convention for the Regulation of Whaling (ICRW), Dec. 2, 1946, 62 Stat. 1716, T. I. A. S. No. 1849 (entered into force Nov. 10, 1948). The ICRW was designed to "provide for the proper conservation of whale stocks and thus make possible the orderly development of the whaling industry," *id.*, at 1717, and today serves as the principal international mechanism for promoting the conservation and development of whale populations. See generally Smith, The International Whaling Commission: An Analysis of the Past and Reflections on the Future, 16 Nat. Resources Law. 543 (1984). The United States was a founding member of the ICRW; Japan joined in 1951.

To achieve its purposes, the ICRW included a Schedule which, *inter alia*, regulates harvesting practices and sets harvest limits for various whale species. Art. I, 62 Stat. 1717, 1723–1727. In addition, the ICRW established the International Whaling Commission (IWC), which implements portions of the Convention and is authorized to amend the Schedule and set new harvest quotas. See Art. III, 62 Stat. 1717–1718; Art. V, 62 Stat. 1718–1719. See generally Smith, *supra*, at 547–550. The quotas are binding on IWC members if accepted by a three-fourths' majority vote. Art. III, 62 Stat. 1717. Under the terms of the Convention, however, the IWC has no power to impose sanctions for quota violations. See Art. IX, 62 Stat. 1720. Moreover, any member country may file a timely objection to an IWC amendment of the Schedule and thereby exempt itself from any obligation

to comply with the limit unless and until the objection is withdrawn. Art. V, 62 Stat. 1718–1719. All nonobjecting countries remain bound by the amendment.

Because of the IWC's inability to enforce its own quota and in an effort to promote enforcement of quotas set by other international fishery conservation programs, Congress passed the Pelly Amendment to the Fishermen's Protective Act of 1967. 22 U. S. C. § 1978. Principally intended to preserve and protect North American Atlantic salmon from depletion by Danish fishermen in violation of the ban imposed by the International Convention for the Northwest Atlantic Fisheries, the Amendment protected whales as well. See 117 Cong. Rec. 34752 (1971) (remarks of Rep. Pelly); H. R. Rep. No. 92–468, p. 6 (1971). The Amendment directs the Secretary of Commerce to certify to the President if "nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program . . . ." 22 U. S. C. § 1978(a)(1). Upon certification, the President, in his discretion, may then direct the Secretary of the Treasury to prohibit the importation of fish products from the certified nation. § 1978(a)(4). The President may also decline to impose any sanctions or import prohibitions.

After enactment of the Pelly Amendment, the Secretary of Commerce five times certified different nations to the President as engaging in fishing operations which "diminish[ed] the effectiveness" of IWC quotas. H. R. Rep. No. 95–1029, p. 9 (1978); 125 Cong. Rec. 22084 (1979) (remarks of Rep. Oberstar). None of the certifications resulted in the imposition of sanctions by the President. After each certification, however, the President was able to use the threat of discretionary sanctions to obtain commitments of future compliance from the offending nations.

Although "the Pelly Amendment . . . served the useful function of quietly persuading nations to adhere to the deci-

sions of international fishery conservation bodies," H. R. Rep. No. 95–1029, *supra,* at 9, Congress grew impatient with the Executive's delay in making certification decisions and refusal to impose sanctions. See 125 Cong. Rec. 22083 (1979) (remarks of Rep. Murphy); *id.,* at 22084 (remarks of Rep. Oberstar). As a result, Congress passed the Packwood Amendment to the Magnuson Fishery Conservation and Management Act, 16 U. S. C. § 1801 *et seq.* (1982 ed. and Supp. III). This Amendment requires the Secretary of Commerce to "periodically monitor the activities of foreign nationals that may affect [international fishery conservation programs]," 22 U. S. C. § 1978(a)(3)(A); "promptly investigate any activity by foreign nationals that, in the opinion of the Secretary, may be cause for certification . . . ," § 1978(a)(3)(B); and "promptly conclude; and reach a decision with respect to; [that] investigation." § 1978(a)(3)(C).

To rectify the past failure of the President to impose the sanctions authorized—but not required—under the Pelly Amendment, the Packwood Amendment removes this element of discretion and mandates the imposition of economic sanctions against offending nations. Under the Amendment, if the Secretary of Commerce certifies that "nationals of a foreign country, directly or indirectly, are conducting fishing operations or engaging in trade or taking which diminishes the effectiveness of the International Convention for the Regulation of Whaling," 16 U. S. C. § 1821(e)(2)(A)(i), the Secretary of State must reduce, by at least 50%, the offending nation's fishery allocation within the United States' fishery conservation zone. § 1821(e)(2)(B). Although the Amendment requires the imposition of sanctions when the Secretary of Commerce certifies a nation, it did not alter the initial certification process, except for requiring expedition. It was also provided that a certificate under the Packwood Amendment also serves as a certification for the purposes of the Pelly Amendment. § 1821(e)(2)(A)(i).

In 1981, the IWC established a zero quota for the Western Division stock of Northern Pacific sperm whales. The next year, the IWC ordered a 5-year moratorium on commercial whaling to begin with the 1985–1986 whaling season and last until 1990. In 1982, the IWC acted to grant Japan's request for a 2-year respite—for the 1982–1983 and 1983–1984 seasons—from the IWC's earlier decision banning sperm whaling.

Because Japan filed timely objections to both the IWC's 1981 zero quota for Northern Pacific sperm whales and 1982 commercial whaling moratorium, under the terms of the ICRW, it was not bound to comply with either limitation. Nonetheless, as the 1984–1985 whaling season grew near, it was apparently recognized that under either the Pelly or Packwood Amendment, the United States could impose economic sanctions if Japan continued to exceed these whaling quotas.

Following extensive negotiations, on November 13, 1984, Japan and the United States concluded an executive agreement through an exchange of letters between the Chargé d'Affaires of Japan and the Secretary of Commerce. See App. to Pet. for Cert. in No. 85–955, pp. 102A–109A. Subject to implementation requirements,[1] Japan pledged to ad-

---

[1] The details of the Japanese commitments were explained in a summary accompanying the letter from the Chargé d'Affaires to the Secretary. First, the countries agreed that if Japan would withdraw its objection to the IWC zero sperm whale quota, Japanese whalers could harvest up to 400 sperm whales in each of the 1984 and 1985 coastal seasons without triggering certification. Japan's irrevocable withdrawal of that objection was to take place on or before December 13, 1984, effective April 1, 1988. App. to Pet. for Cert. in No. 85–955, pp. 104A–105A. Japan fulfilled this portion of the agreement on December 11, 1984. *Id.*, at 110A, 112A–114A.

Second, the two nations agreed that if Japan would end all commercial whaling by April 1, 1988, Japanese whalers could take additional whales in the interim without triggering certification. Japan agreed to harvest no more than 200 sperm whales in each of the 1986 and 1987 coastal seasons. In addition, it would restrict its harvest of other whale species—under lim-

here to certain harvest limits and to cease commercial whaling by 1988. *Id.*, at 104A–106A. In return and after consulting with the United States Commissioner to the IWC, the Secretary determined that the short-term continuance of a specified level of limited whaling by Japan, coupled with its promise to discontinue all commercial whaling by 1988, "would not diminish the effectiveness of the International Convention for the Regulation of Whaling, 1946, or its conservation program." *Id.*, at 107A. Accordingly, the Secretary informed Japan that, so long as Japan complied with its pledges, the United States would not certify Japan under either Amendment. See *id.*, at 104A.

Several days before consummation of the executive agreement, several wildlife conservation groups[2] filed suit in District Court seeking a writ of mandamus compelling the Secretary of Commerce to certify Japan.[3] Because in its view any taking of whales in excess of the IWC quotas diminishes the

its acceptable to the United States after consultation with Japan—through the end of the 1986–1987 pelagic season and the end of the 1987 coastal season. The agreement called for Japan to announce its commitment to terminate commercial whaling operations by withdrawing its objection to the 1982 IWC moratorium on or before April 1, 1985, effective April 1, 1988. *Id*, at 105A–106A.

[2] The original plaintiffs to this action are: American Cetacean Society, Animal Protection Institute of America, Animal Welfare Institute, Center for Environmental Education, The Fund for Animals, Greenpeace U. S. A., The Humane Society of the United States, International Fund for Animal Welfare, The Whale Center, Connecticut Cetacean Society, Defenders of Wildlife, Friends of the Earth, and Thomas Garrett, former United States Representative to the IWC.

[3] In addition, plaintiffs also requested (1) a declaratory judgment that the Secretary's failure to certify violated both the Pelly and Packwood Amendments, because any whaling activities in excess of IWC quotas necessarily "diminishes the effectiveness" of the ICRW; and (2) a permanent injunction prohibiting any executive agreement which would violate the certification and sanction requirements of the Amendments. 604 F. Supp. 1398, 1401 (DC 1985). The Japan Whaling Association and Japan Fishing Association (Japanese petitioners), trade groups representing private Japanese interests, were allowed to intervene.

effectiveness of the ICRW, the District Court granted summary judgment for respondents and ordered the Secretary of Commerce immediately to certify to the President that Japan was in violation of the IWC sperm whale quota. 604 F. Supp. 1398, 1411 (DC 1985). Thereafter, Japan's Minister for Foreign Affairs informed the Secretary of Commerce that Japan would perform the second condition of the agreement — withdrawal of its objection to the IWC moratorium — provided that the United States obtained reversal of the District Court's order. App. to Pet. for Cert. in No. 85–955, pp. 116A–118A.

A divided Court of Appeals affirmed. 247 U. S. App. D. C. 309, 768 F. 2d 426 (1985). Recognizing that the Pelly and Packwood-Magnuson Amendments did not define the specific activities which would "diminish the effectiveness" of the ICRW, the court looked to the Amendments' legislative history and concluded, as had the District Court, that the taking by Japanese nationals of whales in excess of quota automatically called for certification by the Secretary. We granted certiorari, 474 U. S. 1053 (1986), and now reverse.

## II

We address first the Japanese petitioners' contention that the present actions are unsuitable for judicial review because they involve foreign relations and that a federal court, therefore, lacks the judicial power to command the Secretary of Commerce, an Executive Branch official, to dishonor and repudiate an international agreement. Relying on the political question doctrine, and quoting *Baker* v. *Carr*, 369 U. S. 186, 217 (1969), the Japanese petitioners argue that the danger of "embarrassment from multifarious pronouncements by various departments on one question" bars any judicial resolution of the instant controversy.

We disagree. *Baker* carefully pointed out that not every matter touching on politics is a political question, *id.*, at 209, and more specifically, that it is "error to suppose that every

case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.*, at 211. The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *United States ex rel. Joseph* v. *Cannon,* 206 U. S. App. D. C. 405, 411, 642 F. 2d 1373, 1379 (1981) (footnote omitted), cert. denied, 455 U. S. 999 (1982).

As *Baker* plainly held, however, the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts. It is also evident that the challenge to the Secretary's decision not to certify Japan for harvesting whales in excess of IWC quotas presents a purely legal question of statutory interpretation. The Court must first determine the nature and scope of the duty imposed upon the Secretary by the Amendments, a decision which calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below. We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones. We conclude, therefore, that the present cases present a justiciable controversy, and turn to the merits of petitioners' arguments.[4]

---

[4] We also reject the Secretary's suggestion that no private cause of action is available to respondents. Respondents brought suit against the

## III

The issue before us is whether, in the circumstances of these cases, either the Pelly or Packwood Amendment required the Secretary to certify Japan for refusing to abide by the IWC whaling quotas. We have concluded that certifica-

Secretary of Commerce, the head of a federal agency, and the suit, in essence, is one to "compel agency action unlawfully withheld," 5 U. S. C. § 706(1), or alternatively, to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). The "right of action" in such cases is expressly created by the Administrative Procedure Act (APA), which states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review," § 704, at the behest of "[a] person . . . adversely affected or aggrieved by agency action." § 702 (1982 ed., Supp. III). A separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review. See, e. g., *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 345 (1984); *Citizens to Preserve Overton Park* v. *Volpe*, 401 U. S. 402, 410 (1971); *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 141 (1967).

It is clear that respondents may avail themselves of the right of action created by the APA. First, the Secretary's actions constitute the actions of an agency. See 5 U. S. C. § 551(1); *Citizens to Preserve Overton Park* v. *Volpe, supra,* at 410. In addition, there has been "final agency action," in that the Secretary formally has agreed with the Japanese that there will be no certification, and this appears to be an action "for which there is no other adequate remedy in a court," as the issue whether the Secretary's failure to certify was lawful will not otherwise arise in litigation. Next, it appears that respondents are sufficiently "aggrieved" by the agency's action: under our decisions in *Sierra Club* v. *Morton*, 405 U. S. 727 (1972), and *United States* v. *SCRAP*, 412 U. S. 669 (1973), they undoubtedly have alleged a sufficient "injury in fact" in that the whale watching and studying of their members will be adversely affected by continued whale harvesting, and this type of injury is within the "zone of interests" protected by the Pelly and Packwood Amendments. See *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150 (1970). Finally, the Secretary has failed to point to any expressed intention on the part of Congress to foreclose APA review of actions under either Amendment. We find, therefore, that respondents are entitled to pursue their claims under the right of action created by the APA.

tion was not necessary and hence reject the Court of Appeals' holding and respondents' submission that certification is mandatory whenever a country exceeds its allowable take under the ICRW Schedule.

Under the Packwood Amendment, certification is neither permitted nor required until the Secretary makes a determination that nationals of a foreign country "are conducting fishing operations or engaging in trade or taking which diminishes the effectiveness" of the ICRW. It is clear that the Secretary must promptly make the certification decision, but the statute does not define the words "diminish the effectiveness of" or specify the factors that the Secretary should consider in making the decision entrusted to him alone. Specifically, it does not state that certification must be forthcoming whenever a country does not abide by IWC Schedules, and the Secretary did not understand or interpret the language of the Amendment to require him to do so. Had Congress intended otherwise, it would have been a simple matter to say that the Secretary must certify deliberate taking of whales in excess of IWC limits.

Here, as the Convention permitted it to do, Japan had filed its objection to the IWC harvest limits and to the moratorium to begin with the 1985–1986 season. It was accordingly not in breach of its obligations under the Convention in continuing to take whales, for it was part of the scheme of the Convention to permit nations to opt out of Schedules that were adopted over its objections. In these circumstances, the Secretary, after consultation with the United States Commissioner to the IWC and review of the IWC Scientific Committee opinions, determined that it would better serve the conservation ends of the Convention to accept Japan's pledge to limit its harvest of sperm whales for four years and to cease all commerical whaling in 1988, rather than to impose sanctions and risk continued whaling by the Japanese. In any event, the Secretary made the determination assigned to him by the Packwood Amendment and concluded that the

limited taking of whales in the 1984 and 1985 coastal seasons would not diminish the effectiveness of the ICRW or its conservation program, and that he would not make the certification that he would otherwise be empowered to make.

The Secretary, of course, may not act contrary to the will of Congress when exercised within the bounds of the Constitution. If Congress has directly spoken to the precise issue in question, if the intent of Congress is clear, that is the end of the matter. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984). But as the courts below and respondents concede, the statutory language itself contains no direction to the Secretary automatically and regardless of the circumstances to certify a nation that fails to conform to the IWC whaling Schedule. The language of the Pelly and Packwood Amendments might reasonably be construed in this manner, but the Secretary's construction that there are circumstances in which certification may be withheld, despite departures from the Schedules and without violating his duty, is also a reasonable construction of the language used in both Amendments. We do not understand the Secretary to be urging that he has *carte blanche* discretion to ignore and do nothing about whaling in excess of IWC Schedules. He does not argue, for example, that he could refuse to certify for any reason not connected with the aims and conservation goals of the Convention, or refuse to certify deliberate flouting of schedules by members who have failed to object to a particular schedule. But insofar as the plain language of the Amendments is concerned, the Secretary is not forbidden to refuse to certify for the reasons given in these cases. Furthermore, if a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the "executive department's construction of a statutory scheme it is entrusted to administer," *Chevron, supra,* at 844, unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress. *United*

*States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 131 (1985). See *Chemical Mfrs. Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 125 (1985).

## IV

Contrary to the Court of Appeals' and respondents' views, we find nothing in the legislative history of either Amendment that addresses the nature of the Secretary's duty and requires him to certify every departure from the IWC's scheduled limits on whaling. The Pelly Amendment was introduced in 1971 to protect Atlantic salmon from possible extinction caused by overfishing in disregard of established salmon quotas. Under the International Convention for the Northwest Atlantic Fisheries (ICNAF), zero harvest quotas had been established in 1969 to regulate and control high seas salmon fishing. 117 Cong. Rec. 34751 (1971) (remarks of Rep. Dingell). Denmark, Germany, and Norway, members of the ICNAF, exercised their right to file timely objections to the quotas, however, and thus were exempt from their limitations. Although respondents are correct that Congress enacted the Pelly Amendment primarily as a means to enforce those international fishing restrictions against these three countries, particularly Denmark, they fail to establish that the Amendment requires automatic certification of every nation whose fishing operations exceed international conservation quotas.

Both the Senate and House Committee Reports detail the "conservation nightmare" resulting from Denmark's failure to recognize the ICNAF quota; a position which "effectively nullified" the ban on high seas harvesting of Atlantic salmon. S. Rep. No. 92–582, pp. 4–5 (1971); H. R. Rep. No. 92–468, pp. 5–6 (1971). In addition, Danish operations were seen as leading to the "eventual destruction of this valuable sports fish," a matter of "critical concern" to both the Senate and House Committees. S. Rep. No. 92–582, at 4; H. R. Rep. No. 92–468, at 5. There is no question but that both Com-

mittees viewed Denmark's excessive fishing operations as "diminish[ing] the effectiveness" of the ICNAF quotas, and envisioned that the Secretary would certify that nation under the Pelly Amendment. The Committee Reports, however, do not support the view that the Secretary must certify every nation that exceeds every international conservation quota.[5]

The discussion on the floor of the House by Congressman Pelly and other supporters of the Amendment further demonstrates that Congress' primary concern in enacting the Pelly Amendment was to stave off the possible extermination of both the Atlantic salmon as well as the extinction of other heavily fished species, such as whales, regulated by international fishery conservation programs. 117 Cong. Rec. 34752–34754 (1971) (remarks of Reps. Pelly, Wylie, Clausen, and Hogan). The comments of Senator Stevens, acting Chairman of the reporting Senate Committee and the only

---

[5] The Court of Appeals relied upon the statement in S. Rep. No. 92–582 that the purpose of the Amendment was "'to prohibit the importation of fishery products from nations that do not conduct their fishing operations in a manner that is consistent with international conservation programs. It would accomplish this by providing that whenever the Secretary of Commerce determines that a country's nationals are fishing in such a manner, he must certify such fact to the President.'" 247 U. S. App. D. C. 309, 319, 768 F. 2d 426, 436 (1985) (emphasis omitted), quoting S. Rep. No. 92–582, at 2. This is indeed an explicit statement of purpose, but this is not the operative language in the statute chosen to effect that purpose. The section-by-section analysis contained in the same Report recites that the operative section directs the Secretary of Commerce to certify to the President the fact that nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international conservation program whenever he determines the existence of such operations. Id., at 5. These are not the words of a ministerial duty, but the imposition of duty to make an informed judgment. Even respondents do not contend that every merely negligent or unintentional violation must be certified. It should be noted that the statement of purpose contained in the House Report tracks the language of the operative provisions of the Amendment. H. R. Rep. No. 92–468, p. 2 (1971).

speaker on the bill during the Senate debate, were to the same effect. See *id.*, at 47054 (if countries continue indiscriminately to fish on the high seas, salmon may become extinct). Testimony given during congressional hearings on the Pelly Amendment also supports the conclusion that Congress had no intention to require the Secretary to certify every departure from the limits set by an international conservation program.[6]

Subsequent amendment of the Pelly Amendment in 1978 further demonstrates that Congress used the phrase, "diminish the effectiveness," to give the Secretary a range of certification discretion. The 1978 legislation expanded coverage of the Pelly Amendment "to authorize the President to embargo wildlife products from countries where nationals have acted in a manner which, directly or indirectly, diminishes the effectiveness of any international program for the conservation of endangered or threatened species." H. R. Rep. No. 95–1029, p. 8 (1978). This extension was premised on the success realized by the United States in using the

---

[6] Representative Pelly testified at the Senate hearings that the sanctions authorized by the Amendment were to be applied "in the case of flagrant violation of any international fishery conservation program to which the United States has committed itself." Hearings on S. 1242 et al. before the Subcommittee on Oceans and Atmosphere of the Senate Committee on Commerce, 92d Cong., 1st Sess., 47 (1971). Similarly, Donald McKernan, Special Assistant for Fisheries and Wildlife, and Coordinator of Ocean Affairs, United States Department of State, stated:

"We do not anticipate that there would be any need to invoke the proposed legislation where conservation needs are effectively met by the agreement of all nations involved to an international conservation regime.

"However, there are some situations where one or more nations have failed to agree to a program otherwise agreed among the involved nations, or having once agreed failed to abide by the agreement.

"Under the proposed legislation, if the action of such countries diminished the effectiveness of the international fishery conservation program, consideration would need to be given to taking trade measures as necessary to support the conservation program." *Id.*, at 97.

Amendment to convince other nations to adhere to IWC quotas, thus preserving the world's whale stocks. *Id.*, at 9.

In the House Report for the 1978 amendment, the Merchant Marine and Fisheries Committee specifically addressed the "diminish the effectiveness" standard and recognized the Secretary's discretion in making the initial certification decision:

> "The nature of any trade or taking which qualifies as diminishing the effectiveness of any international program for endangered or threatened species will depend on the circumstances of each case. In general, however, the trade or taking must be serious enough to warrant the finding that the effectiveness of the international program in question has been diminished. An isolated, individual violation of a convention provision will not ordinarily warrant certification under this section." *Id.*, at 15.

This statement makes clear that, under the Pelly Amendment as construed by Congress, the Secretary is to exercise his judgment in determining whether a particular fishing operation "diminishes the effectiveness" of an international fishery conservation program like the IWC.[7]

---

[7] The Committee also detailed two actions which "dramatically demonstrate[d] the value of the Pelly amendment to the United States in the conduct of international fishery negotiations." H. R. Rep. No. 95–1029, p. 9 (1978).

"In November, 1977, the Secretary of Commerce reported to the President that two nonmembers of the IWC—Peru and Korea—were taking whales in excess of IWC quotas. In March, 1978, the Secretary of Commerce reported to the subcommittee that although these nations are violating IWC quotas, certification under the Pelly amendment is pending a thorough documentation and substantiation of each action that may diminish the effectiveness of the IWC conservation program." *Ibid.*

The fact that the Committee approved of the Secretary's actions in not automatically certifying these nations, even though they were found to be taking whales in excess of IWC quotas, is additional evidence that the Pelly Amendment does not require the *per se* rule respondents now urge.

The Court of Appeals held that this definition applies only to the 1978 addition to the Pelly Amendment, designed to enforce the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), Mar. 3, 1973, 27 U. S. T. 1087, T. I. A. S. No. 8249, and not to the ICRW. We are unpersuaded. Congress perceived the two Conventions as seeking the same objectives. Both programs are designed to conserve endangered or threatened species, whether it be the sperm whale or the stumptail macaque. See H. R. Rep. No. 95–1029, pp. 9–10 (1978). This explains why the House Report noted that the purpose behind the 1978 extension of the Pelly Amendment was "to expand the success the United States has achieved in the conservation of whales to the conservation of endangered and threatened species." *Id.*, at 9.

Both Conventions also operate in a similar, and often parallel, manner,[8] and nothing in the legislative history of the 1978 amendment shows that Congress intended the phrase "diminish the effectiveness" to be applied inflexibly with respect to departures from fishing quotas, but to be applied flexibly vis-à-vis departures from endangered species quotas. Without strong evidence to the contrary, we doubt that Congress intended the same phrase to have significantly different

---

[8] The CITES regulates trade in endangered and threatened species through inclusion of those species in one of three Appendices. CITES, Arts. II–IV, 27 U. S. T. 1092–1097. The ICRW regulates whaling through the use of a Schedule which sets harvest limits for whale species. ICRW, Art. V, 62 Stat. 1718–1719. The CITES requires a two-thirds' majority vote to amend an Appendix to include an additional species. CITES, Art. XV, 27 U. S. T. 1110–1112. The ICRW requires a three-fourths' majority vote to amend the Schedule or to adopt regulations. ICRW, Art. III, 62 Stat. 1717. Both Conventions also contain analogous procedures for member nations to file timely objections to limitations imposed by the Convention. Compare CITES, Art. XV, 27 U. S. T. 1110–1112, with ICRW, Art. V, 62 Stat. 1719. See generally Recent Development, International Conservation—United States Enforcement of World Whaling Programs, 26 Va. J. Int'l L. 511, 531–532 (1986).

meanings in two adjoining paragraphs of the same subsection. See *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 488–489 (1985); *Morrison-Knudsen Constr. Co.* v. *Director, OWCP*, 461 U. S. 624, 633 (1983). Congress' explanation of the scope of the Secretary's certification duty applies to both the original Pelly Amendment and the 1978 amendment: the Secretary is empowered to exercise his judgment in determining whether "the trade or taking [is] serious enough to warrant the finding that the effectiveness of the international program in question has been diminished." H. R. Rep. No. 95–1029, *supra*, at 15.

Enactment of the Packwood Amendment did not negate the Secretary's view that he is not required to certify every failure to abide by ICW's whaling limits. There were hearings on the proposal but no Committee Reports. It was enacted as a floor amendment. It is clear enough, however, that it was designed to remove executive discretion in imposing sanctions once certification had been made—as Senator Packwood put it, "to put real economic teeth into our whale conservation efforts," by requiring the Secretary of State to impose severe economic sanctions until the transgression is rectified. 125 Cong. Rec. 21742 (1979). But Congress specifically retained the identical certification standard of the Pelly Amendment, which requires a determination by the Secretary that the whaling operations at issue diminish the effectiveness of the ICRW. 16 U. S. C. § 1821(e)(2)(A)(i). See 125 Cong. Rec. 21743 (1979) (remarks of Sen. Magnuson); *id.*, at 22083 (remarks of Rep. Breaux); *id.*, at 22084 (remarks of Rep. Oberstar). We find no specific indication in this history that henceforth the certification standard would require the Secretary to certify each and every departure from ICW's whaling Schedules.[9]

---

[9] Indeed, to the extent that the hearings on the Packwood Amendment are indicative of congressional intent, they support the Secretary's view of his duty and authority to certify whaling in excess of IWC limits. Hearings before the Subcommittee on Fisheries and Wildlife Conservation and

It may be that in the legislative history of these Amendments there are scattered statements hinting at the *per se* rule advocated by respondents, but read as a whole, we are quite unconvinced that this history clearly indicates, contrary to what we and the Secretary have concluded is a permissible reading of the statute, that all departures from IWC Schedules, regardless of the circumstances, call for immediate certification.[10]

## V

We conclude that the Secretary's construction of the statutes neither contradicted the language of either Amendment, nor frustrated congressional intent.    See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S.,

---

the Environment of the House Committee on Merchant Marine and Fisheries, 96 Cong., 1st Sess., 311–312, 317 (1979).

We note also that in 1984, Senator Packwood introduced a further amendment to the Packwood Amendment.    This proposal required that " '[a]ny nation whose nationals conduct commercial whaling operations [after 1986] unless such whaling has been authorized by the International Whaling Commission shall be deemed to be certified for the purposes of this [act].' "    Quoted in Comment, The U. S.-Japanese Whaling Accord: A Result of the Discretionary Loophole in the Packwood-Magnuson Amendment, 19 Geo. Wash. J. Int'l L. & Econ. 577, 609, n. 220 (1986).    Congress thus had the express opportunity to mandate that the Secretary certify any foreign nation which exceeds an IWC quota, but chose not to do so.

[10] The "diminish the effectiveness of" standard has been used in legislation other than the Pelly and Packwood Amendments.    It first appeared in the 1962 amendment to the Tuna Convention Act of 1950, 64 Stat. 777, 16 U. S. C. § 951 *et seq.*    It was also used in 1984 in the Eastern Pacific Tuna Licensing Act, 16 U. S. C. § 972 *et seq.* (1982 ed., Supp. III), which was enacted to implement the Eastern Pacific Ocean Tuna Fishing Agreement. Nothing has been called to our attention in the history of these Acts to indicate that this standard calls for automatic certification once the Secretary has discovered that foreign nationals are violating an international fishing convention or agreement.    Indeed, to the extent they are relevant, they lend affirmative support to the position that Congress has employed the standard to vest a range of judgment in the Secretary as to whether a departure from an agreed limit diminishes the effectiveness of the international conservation effort and hence calls for certification.

at 842–843. In enacting these Amendments, Congress' primary goal was to protect and conserve whales and other endangered species. The Secretary furthered this objective by entering into the agreement with Japan, calling for that nation's acceptance of the worldwide moratorium on commercial whaling and the withdrawal of its objection to the IWC zero sperm whale quota, in exchange for a transition period of limited additional whaling. Given the lack of any express direction to the Secretary that he must certify a nation whose whale harvest exceeds an IWC quota, the Secretary reasonably could conclude, as he has, that, "a cessation of all Japanese commercial whaling activities would contribute more to the effectiveness of the IWC and its conservation program than any other single development." Affidavit of Malcolm Baldrige, Brief for Petitioners in No. 85–955, Addendum III, pp. 6A–7A.

We conclude, therefore, that the Secretary's decision to secure the certainty of Japan's future compliance with the IWC's program through the 1984 executive agreement, rather than rely on the possibility that certification and imposition of economic sanctions would produce the same or better result, is a reasonable construction of the Pelly and Packwood Amendments. Congress granted the Secretary the authority to determine whether a foreign nation's whaling in excess of quotas diminishes the effectiveness of the IWC, and we find no reason to impose a mandatory obligation upon the Secretary to certify that every quota violation necessarily fails that standard. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE REHNQUIST join, dissenting.

Since 1971, Congress has sought to lead the world, through the repeated exercise of its power over foreign commerce, in preventing the extermination of whales and other threatened species of marine animals. I deeply regret that it will now

have to act again before the Executive Branch will finally be compelled to obey the law. I believe that the Court has misunderstood the question posed by the case before us, and has reached an erroneous conclusion on a matter of intense worldwide concern. I therefore dissent.

Congress began its efforts with the Pelly Amendment, which directs that "[w]hen the Secretary of Commerce determines that nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program, the Secretary of Commerce shall certify such fact to the President." 22 U. S. C. § 1978(a)(1). That Amendment, although apparently mandatory in its certification scheme, did not provide for a mandatory response from the President once the certification was made. Rather, the President was empowered, in his discretion, to impose sanctions on the certified nations or not to act at all. § 1978(a)(4).

This executive latitude in enforcement proved unsatisfactory. Between 1971 and 1978, every time that a nation exceeded international whaling quotas—on five occasions—the Secretary of Commerce duly certified to the President that the trespassing nation had exceeded whaling quotas set by the International Whaling Commission and had thus diminished the effectiveness of the conservation program. See App. 168, 177.* Although the offending nations had promised immediate compliance, the Secretary apparently believed that he was obliged to certify the past violations. Yet on the basis of those assurances, the President each time exercised his option under the Pelly Amendment to impose no sanctions on the violators. *Id.*, at 193, 195.

Unhappy with the President's failure to sanction clear violations of international whaling agreements, Congress re-

*Citations to "App." refer to the joint appendix filed by the parties in the Court of Appeals; the Solicitor General sought and was granted leave not to file a joint appendix in this Court. 475 U. S. 1007 (1986).

sponded in 1979 with the Packwood Amendment. That Amendment provides that if the Secretary of Commerce certifies that a country is diminishing the effectiveness of the International Convention for the Regulation of Whaling, the Secretary of State must reduce the fishing allocation of the offending nation by at least 50 percent. 16 U. S. C. § 1821(e)(2). It also provides certain time limits within which the Executive Branch must act in imposing the mandatory sanctions. The automatic imposition of sanctions, it seemed, would improve the effectiveness of the Pelly Amendment by providing a definite consequence for any nation disregarding whaling limits. See 125 Cong. Rec. 22084 (1979) (statement of Rep. Oberstar).

In 1984, the Secretary of Commerce for the first time declined to certify a case of intentional whaling in excess of established quotas. Rather than calling into play the Packwood Amendment's mandatory sanctions by certifying to the President Japan's persistence in conducting whaling operations, Secretary Baldrige set about to negotiate with Japan, using his power of certification under domestic law to obtain certain promises of reduced violations in future years. In the resulting compromise, the Secretary agreed not to certify Japan, provided that Japan would promise to reduce its whaling until 1988 and then withdraw its objection to the international whaling quotas. Arguing that the Secretary had no discretion to withhold certification, respondents sought review of the Secretary's action in federal court. Both the District Court, 604 F. Supp. 1398 (DC 1985), and the Court of Appeals, 247 U. S. App. D. C. 309, 768 F. 2d 426 (1985), found that Congress had not empowered the Secretary to decline to certify a clear violation of International Whaling Commission (IWC) quotas, and ordered the Secretary to make the statutory certification. This Court now renders illusory the mandatory language of the statutory scheme, and finds permissible exactly the result that Congress sought to

244

prevent in the Packwood Amendment: executive compromise of a national policy of whale conservation.

## I

The Court devotes its opinion to the question whether the language of the Pelly or the Packwood Amendment leaves room for discretion in the Secretary to determine that a violation of the whaling quota need not be certified. Although framed in the same way by the Court of Appeals and by the parties before this Court, that issue is not the most direct approach to resolving the dispute before us. Indeed, by focusing entirely on this question, the Court fails to take into account the most significant aspect of these cases: that even the Secretary himself has not taken the position that Japan's past conduct is not the type of activity that diminishes the effectiveness of the whale conservation program, requiring his certification under the Pelly Amendment. In the face of an IWC determination that only a zero quota will protect the species, never has the Secretary concluded, nor could he conclude, that the intentional taking of large numbers of sperm whales does *not* diminish the effectiveness of the IWC program. Indeed, the Secretary has concluded just the opposite. Just four months before the execution of the bilateral agreement that spawned this litigation, Senator Packwood wrote to the Secretary as follows:

> "It has been assumed by everyone involved in this issue, including the whaling nations, that a nation which continues commercial whaling after the IWC moratorium takes effect would definitely be certified. I share this assumption since I see no way around the logical conclusion that a nation which ignores the moratorium is diminishing the effectiveness of the IWC.
>
> "What I am asking, Mac, is that you provide me with an assurance that it is the position of the Commerce Department that any nation which continues whaling after the moratorium takes effect will be certified under

Packwood-Magnuson." App. 197 (letter from Sen. Packwood to Secretary Baldrige, June 28, 1984).

The Secretary expressed his agreement:

"You noted in your letter the widespread view that any continued commercial whaling after the International Whaling Commission (IWC) moratorium decision takes effect would be subject to certification. I agree, since any such whaling attributable to the policies of a foreign government would clearly diminish the effectiveness of the IWC." *Id.*, at 198 (letter from Secretary Baldrige to Sen. Packwood, July 24, 1984).

It has not been disputed that Japan's whaling activities have been just as described in that correspondence. The Secretary's expressed view is borne out by his apparent belief, four months later, that he held sufficient power under domestic law to threaten certification in an effort to extract promises from Japan regarding its future violations. Presumably he would not threaten such certification without believing that the factual predicate for that action existed.

I cannot but conclude that the Secretary has determined in these cases, *not* that Japan's past violations are so negligible that they should not be understood to trigger the certification obligation, but that he would prefer to impose a *penalty* different from that which Congress prescribed in the Packwood Amendment. Significantly, the Secretary argues here that the agreement he negotiated with Japan will—in the future—protect the whaling ban more effectively than imposing sanctions now. Brief for Federal Petitioners 43. But the regulation of future conduct is irrelevant to the certification scheme, which affects future violations only by punishing past ones. The Secretary's manipulation of the certification process to affect punishment is thus an attempt to evade the statutory sanctions rather than a genuine judgment that the effectiveness of the quota has not been diminished.

The Secretary would rewrite the law. Congress removed from the Executive Branch any power over penalties when it passed the Packwood Amendment. Indeed, the Secretary's compromise in these cases is precisely the type of action, previously taken by the President, that led Congress to enact the mandatory sanctions of the Packwood Amendment: in 1978, five nations had been found to have exceeded quotas, but the President had withheld sanctions upon the promise of future compliance with international norms. Here, the future "compliance" is even less satisfactory than that exacted in the past instances: instead of immediate compliance, the Secretary has settled for continued violations until 1988. And in 1988 all that Japan has promised is to withdraw its formal objection to the IWC moratorium; I see no indication that Japan has pledged to "cease commercial whaling by 1988," *ante*, at 228, or to "dismantle its commercial whaling industry." Brief for Federal Petitioners 43. The important question here, however, is not whether the Secretary's choice of sanctions was wise or effective, but whether it was authorized. The Court does not deny that Congress intended the consequences of actions diminishing the effectiveness of a whaling ban to be governed exclusively by the sanctions enumerated in the Packwood Amendment, with the optional addition of those provided in the Pelly Amendment. Thus, when the Secretary's action here, well intentioned or no, is seen for what it really is—a substitute of his judgment for Congress' on the issue of how best to respond to a foreign nation's intentional past violation of quotas—there can be no question but that the Secretary has flouted the express will of Congress and exceeded his own authority. On that basis alone, I would affirm the judgment of the Court of Appeals.

## II

A quite separate concern is raised by the majority's treatment of the issue that it does address. The Court peremptorily rejects the Court of Appeals' conclusion that Congress in-

tended the Pelly Amendment to impose a nondiscretionary duty on the Secretary of Commerce to certify whenever a nation has exceeded whaling quotas. Asserting that "we find nothing in the legislative history of either Amendment that addresses the nature of the Secretary's duty and requires him to certify every departure from the IWC's scheduled limits on whaling," *ante,* at 234, the Court has simply ignored the many specific citations put forth by respondents and the Court of Appeals to just such authority, and has offered nothing to contradict them.

The Court of Appeals devoted voluminous portions of its opinion to excerpts from legislative history establishing that Congress expected that substantial violations of whaling quotas would always result in certification. Illustrative of these are the following exchanges between Members of Congress and Richard A. Frank, Administrator of the National Oceanic and Atmospheric Administration, discussing the meaning of the Pelly Amendment in preparation for the 1979 legislation:

"Mr. McCLOSKEY. . . . Now, it seems to me the discretion then is left with the President and the Secretary of the Treasury, not with the Secretary of Commerce. If you have determined, as you in your testimony indicate, that Japan is importing non-IWC whale products, *I do not see where you have any discretion to politely say to the Japanese you are violating our rules, but we will withhold certifying if you will change.* . . . [T]he certification is a mandatory act under the law. It is not a discretionary act.

"Mr. FRANK. That is correct.

.        .        .        .        .

"Mr. BREAUX. I understand, Mr. Frank, that actually what we are talking about under the Pelly amendment is a two-stage process. First, if a country is violating the terms of an international treaty, the Secretary of Commerce has to certify that he is doing that, and that is not a discretionary thing. But after he certi-

fies that there is a violation, and there is discretion on the part of the President to impose any import quotas, or the elimination of any imported fish products from that country and, the second part is the optional authority that the President has.

"Mr. FRANK. That is correct. The first one is mandatory on the Secretary of Commerce. The second is discretionary on the part of the President." Hearings on Whaling Policy and International Whaling Commission Oversight before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 96th Cong., 1st Sess., 301, 322–323 (1979) (emphasis added).

Representative Breaux summarized the administration's representations to Congress:

"Apparently Dick Frank is saying that the taking of whales in violation of IWC quotas is something that automatically would require the Department of Commerce to certify that nation as being in violation of the taking provision. Then you get into two other categories, not supplying enough data and the importation of whale meat [which involve discretion on the part of the Secretary]." Id., at 359 (remarks of Rep. Breaux).

This and other legislative history relied on by the Court of Appeals demonstrate that Congress believed that, under the Pelly Amendment, when a nation clearly violated IWC quotas, the only discretion in the Executive Branch lay in the choice of sanction. The Packwood Amendment removed that discretion. The majority speculates that "it would have been a simple matter to say that the Secretary must certify deliberate taking of whales in excess of IWC limits," ante, at 232. However, because everyone in the Congress and the Executive Branch appeared to share an understanding that quota violations would always be considered to diminish the

effectiveness of a conservation program, in accord with the consistent interpretations of past Secretaries of Commerce, there was no need to amend the statute. It was only when Secretary Baldrige became dissatisfied with the Packwood Amendment sanctions that the certification obligation was ever questioned.

The sole support that the Court offers for its position is the unobjectionable proposition, in a House Report, that "'[a]n isolated, individual violation of a convention provision will not ordinarily warrant certification under this section.'" *Ante*, at 237 (quoting H. R. Rep. No. 95–1029, p. 15 (1978)). Petitioners indeed have a respectable argument that the Secretary was left with some inherent discretion to ignore violations of a *de minimis* nature. Such an argument, however, has no relevance to these cases. It is uncontested here that Japan's taking of whales has been flagrant, consistent, and substantial. Such gross disregard for international norms set for the benefit of the entire world represents the core of what Congress set about to punish and to deter with the weapon of reduced fishing rights in United States waters. The Court's decision today leaves Congress no closer to achieving that goal than it was in 1971, before either Amendment was passed.

## III

I would affirm the judgment below on the ground that the Secretary has exceeded his authority by using his power of certification, not as a means for identifying serious whaling violations, but as a means for evading the constraints of the Packwood Amendment. Even focusing, as the Court does, upon the distinct question whether the statute prevents the Secretary from determining that the effectiveness of a conservation program is not diminished by a substantial transgression of whaling quotas, I find the Court's conclusion utterly unsupported. I am troubled that this Court is empowering an officer of the Executive Branch, sworn to uphold and defend the laws of the United States, to ignore Congress'

pointed response to a question long pondered: "whether Leviathan can long endure so wide a chase, and so remorseless a havoc; whether he must not at last be exterminated from the waters, and the last whale, like the last man, smoke his last pipe, and then himself evaporate in the final puff." H. Melville, Moby Dick 436 (Signet ed. 1961).