901 F.2d 673
 20 Envtl. L. Rep. 20,801
 The NATIONAL WILDLIFE FEDERATION and the North Dakota
Wildlife Federation, Appellants,
v.
The AGRICULTURAL STABILIZATION AND CONSERVATION SERVICE, an
agency of the United States Department of
Agriculture, and the Bottineau County
Water Resource District, Appellees.
 No. 89-5474.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 12, 1990.
Decided April 19, 1990.
 
 1
 Anthony N. Turrini, Bismarck, N.D., for appellants.
 
 
 2
 Patricia M. Bryan, Washington, D.C., for appellees.
 
 
 3
 Before LAY, Chief Judge, BEAM, Circuit Judge, and HANSON, Senior District Judge.*
 
 
 4
 HANSON, Senior District Judge.
 
 
 5
 The sole issue presented by this appeal is whether appellants have standing to challenge the decision of the Agricultural Stabilization and Conservation Service (ASCS) to exempt approximately 6,500 acres of prairie wetland in North Dakota from the protection of the wetland conservation provisions of the Food Security Act of 1985. The 6,500 acres constitute the Bottineau County Water Resource District--a drainage district heavily regulated by the laws of North Dakota. The District Court, the Honorable Patrick A. Conmy, ruled that appellants lacked standing. We reverse, holding that the National Wildlife Federation and the North Dakota Wildlife Federation (Wildlife Federations) have the right to present their claim in federal court.[1]
 
 Background
 
 6
 The wetland conservation (Swampbuster) provisions of the Food Security Act of 1985 provide that "any person who in any crop year produces an agricultural commodity on converted wetland shall be ineligible for" federal agricultural subsidies with regard to that commodity. 16 U.S.C. Sec. 3821 (1988). The affected subsidies include: any type of price support or payment; farm storage facility loans; federal crop insurance; agricultural disaster payments; a farm loan made, insured or guaranteed by the Farmers Home Administration (FmHA); and commodity storage payments. Id. Thus, the law provides substantial economic disincentives to any landowner considering converting wetland into cropland, although it does not actually prohibit such conversion.
 
 
 7
 There are four exemptions to the Swampbuster provisions, including an exemption for converted wetland where "the conversion of such wetland was commenced before December 23, 1985." 16 U.S.C. Sec. 3822 (1988). The legislation is administered by state and local ASCS committees under the supervision of ASCS. 7 C.F.R. Sec. 12.6(b)(1) (1989). This lawsuit arose after the Bottineau County ASCS committee, in September of 1988, granted the Bottineau County Water Resource District (Bottineau District) a blanket exemption for the 139 square miles at issue finding that the "commenced before December 23, 1985" exemption applied to the entire area. A similar determination made by the same committee in January of 1987 had been reversed by the ASCS Deputy Administrator (Administrator) in Washington D.C. in April of 1987. Appellants brought this suit after the Administrator declined their request to similarly reverse the September 1988 determination.
 
 
 8
 The Wildlife Federations asserted in their complaint that granting the exemption for the entire 6500 acre area violated the Swampbuster provisions, and they requested an injunction compelling the ASCS to reverse and rescind its decision granting the Bottineau District an exemption. The suit was brought on behalf of the Wildlife Federations and their members living and working within the affected area.
 
 
 9
 The district court dismissed appellants' complaint prior to the completion of discovery, and without reaching the merits, holding that they lacked standing to challenge the ASCS decision to grant the exemption. The court did recognize that Sec. 10 of the Administrative Procedures Act (APA) grants a cause of action to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. Sec. 702 (1988). However, it held that appellants' injuries were insufficient to give them standing under Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). National Wildlife Federation v. ASCS, No. A4-89-067, slip op. at 4 (N.D. Aug. 2, 1989).
 
 
 10
 The Wildlife Federations argue that they alleged sufficient injury to establish standing. Paragraph 27 of their complaint alleges:
 
 
 11
 [w]ithout the financial disincentives of Swampbuster, the District and the producers in the White Spur/Stone Creek project area will convert wetlands to cropland, thereby injuring Plaintiffs' members who have a significant interest in preserving these valuable resources. Several of Plaintiffs' members live in the White Spur drainage area. Other members work or recreate there. Plaintiffs' members appreciate the aesthetic values of the intact wetlands and enjoy watching, feeding and photographing wetland wildlife. * * * Plaintiffs' members enjoy the hunting opportunities afforded by the threatened wetlands. * * * One of Plaintiffs' members leases wetland acreage in the White Spur drainage area specifically for hunting purposes. Plaintiffs' members also benefit from the flood control, groundwater recharge, and water purification capabilities of the wetlands. Several members rely on groundwater sources within the project area and are threatened by water shortages and pesticide contamination. The drainage of the wetlands in the White Spur/Stone Creek drainage area as a result of the commenced determination granted by the Bottineau County ASCS committee will permanently deprive Plaintiffs' members of the use and enjoyment of these natural resources.
 
 
 12
 Appellants also provided affidavits from six of their members living within the exempted area, who alleged they would suffer the specific injuries outlined in the complaint unless the exemption were withdrawn. The affidavit of James and Deanna Lauckner is representative of these affidavits. It asserts that: they are members of the National Wildlife Federation; they own, operate and live on a farm in the exempted area and are opposed to the exemption; they enjoy and benefit from the aesthetic values of the affected wetlands including watching, feeding and hunting wetland wildlife; the granting of the exemption will deprive them of their use and enjoyment of the wetlands because it will result in increased wetland conversion resulting in decreased wildlife populations; and the exemption will threaten their use of well water for domestic water needs because the conversion of additional wetland will both lower the water table and decrease water purity.
 
 Standing Analysis
 
 13
 The standing requirement arises from the Constitution's limitation of the power of federal courts to deciding actual "cases" and "controversies". U.S. Const. Art. III, Sec. 2. It focuses on whether the party seeking to bring a complaint before a federal court "is a proper party to request an adjudication of a particular issue." Flast v. Cohen, 392 U.S. 83, 100, 88 S.Ct. 1942, 1952-53, 20 L.Ed.2d 947 (1968). "To be a proper litigant, the party must have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.' " Defenders of Wildlife v. Hodel, 851 F.2d 1035, 1038 (8th Cir.1988) (quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978)).
 
 
 14
 The Supreme Court has specified three requirements that must be met to satisfy this constitutional requirement. The party must show he "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758-59, 70 L.Ed.2d 700 (1982). The injury must be "fairly" traceable "to the challenged action," and it must be likely that the injury will be "redressed by a favorable decision." Id. Appellants must also satisfy the prudential requirement that "the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the" Swampbuster provisions. Defenders of Wildlife, 851 F.2d at 1039 n. 2 (quoting Sierra Club v. Morton, 405 U.S. at 733, 92 S.Ct. at 1365).
 
 Actual or Threatened Injury
 
 15
 Morton and United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), are the landmark cases for determining whether appellants have alleged sufficient personal injury to satisfy the first of the Constitutional requirements of standing. Additional guidance is provided by our opinions in Defenders of Wildlife and Coalition for the Environment v. Volpe, 504 F.2d 156 (8th Cir.1974).
 
 
 16
 In Morton the Supreme Court addressed the issue of whether the Sierra Club had standing to challenge a government decision to develop an extensive skiing resort in Mineral King Valley in Sequoia National Forest. The Court ruled that harm to aesthetic or environmental well-being can constitute injury sufficient to support standing. 405 U.S. at 734, 92 S.Ct. at 1365-66. "We do not question that this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing under Sec. 10 of the APA. Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society." Id. at 734, 92 S.Ct. at 1366. However, the Court ruled that the Sierra Club lacked standing to bring its challenge because it had failed "to allege that it or its members would be affected in any of their activities or pastimes by the * * * development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose." Id. at 735, 92 S.Ct. at 1366.
 
 
 17
 Two years later the Supreme Court explained and expanded on the Morton holding in United States v. SCRAP. In SCRAP an organization consisting of five law students, Students Challenging Regulatory Agency Procedures (SCRAP), brought suit to challenge a freight rate increase. 412 U.S. at 678, 93 S.Ct. at 2411. SCRAP alleged that each of its members suffered "economic, recreational and aesthetic harm directly as a result of the adverse environmental impact of the railroad freight structure." Id. SCRAP alleged the following attenuated line of causation of its injury:
 
 
 18
 a general rate increase would allegedly cause increased use of nonrecyclable commodities as compared to recyclable goods [because of the resulting increased costs of transporting recyclable materials], thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area.
 
 
 19
 Id. at 688, 93 S.Ct. at 2416. SCRAP alleged this would injure it because its members used the natural resources in the Washington area for recreational purpose. Id. at 678, 93 S.Ct. at 2411. The Supreme Court found SCRAP's allegations sufficient to establish standing. Id. at 690, 93 S.Ct. at 2417.
 
 
 20
 Several of the Court's rulings in SCRAP are relevant to this case. SCRAP reaffirmed Morton's holding that harm to a party's use and enjoyment of natural resources is sufficient injury to support standing. SCRAP, 412 U.S. at 686, 93 S.Ct. at 2415. The Court held that "standing is not to be denied simply because many people suffer the same injury." Id. at 687, 93 S.Ct. at 2416. "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." Id. at 688, 93 S.Ct. at 2416. Finally, the Court rejected the government's request to "limit standing to those who have been 'significantly' affected by agency action." Id. at 689 n. 14, 93 S.Ct. at 2417 n. 14.
 
 
 21
 [E]ven if we could begin to define what such a test would mean, we think it fundamentally misconceived. "Injury in fact" reflects the statutory requirement that a person be "adversely affected" or "aggrieved," and it serves to distinguish a person with a direct stake in the outcome of a litigation--even though small--from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, * * * a $5 fine and costs, * * * and a $1.50 poll tax, * * *. While these cases were not dealing specifically with Sec. 10 of the APA, we see no reason to adopt a more restrictive interpretation of "adversely affected" or "aggrieved." As Professor Davis has put it: "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation."
 
 
 22
 Id.
 
 
 23
 The injuries appellants allege their members will suffer because of the actions of the ASCS--a decrease in water supplies and of soil moisture for growing crops, a decrease in the purity of the water they use for domestic needs, a decrease in wetlands and wetland wildlife available to them for aesthetic purposes--are more than an identifiable trifle. They "are statements of specific injury experienced by ascertainable individuals who" live in or recreate in the Bottineau District. Coalition for the Environment, 504 F.2d at 156. Thus, appellants have alleged sufficient injury to establish standing under SCRAP and Morton. "An interest in aesthetic, conservational, and recreational values will support standing when an organizational plaintiff alleges that its members use the area and will be adversely affected." Defenders of Wildlife, 851 F.2d at 1040 (relying on SCRAP and Morton ). See also, Coalition for the Environment, 504 F.2d at 167.
 
 Traceable and Redressable
 
 24
 The next issues we address are whether the injuries are "fairly" traceable to the challenged action (the decision of the ASCS to grant the Bottineau District an exemption from the Swampbuster provisions), and whether there is a likelihood that the injuries would be "redressed by a favorable decision". Appellants allege that these requirements are satisfied asserting that some landowners in the Bottineau District will convert their wetland if they are exempt from the economic penalties of the Swampbuster provisions, who will not do so if they are not exempt. They further allege that the destruction of wetland in the Bottineau District acts in a cumulative manner to cause them the injuries discussed in the previous section.
 
 
 25
 In determining whether traceability and redressability are present we do not review the facts to see if appellants have proven their allegations. Instead, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). This case was disposed of on a motion to dismiss. Thus, unless appellants' allegations are incapable of proof at trial, we must accept them as true. SCRAP, 412 U.S. at 689, 93 S.Ct. at 2416-17.
 
 
 26
 Appellants' allegations are not incapable of proof at trial. There is nothing in the record which establishes that appellants are incapable of establishing that some landowners will convert their wetland if they are protected from the economic penalties of the Swampbuster provisions, but will not do so if they are not. Similarly, the alleged link between the destruction of wetland and appellants' asserted injuries is not so speculative that it is incapable of proof. The United States Congress, in an associated bill, has made the following findings:
 
 
 27
 (1) wetlands play an integral role in maintaining the quality of life through material contributions to our national economy, food supply, water supply and quality, flood control, and fish, wildlife, and plant resources, and thus to the health, safety, recreation, and economic well-being of all our citizens of the Nation;
 
 
 28
 (2) wetlands provide habitat essential for the breeding, spawning, nesting, migration, wintering and ultimate survival of a major portion of the migratory and resident fish and wildlife of the Nation; including migratory birds, * * * and contain many unique species and communities of wild plants; * * *
 
 
 29
 (4) wetlands, and the fish, wildlife, and plants dependent on wetlands, provide significant recreational and commercial benefits, including--* * *
 
 
 30
 (C) fishing, hunting, birdwatching, nature observation and other wetland related recreational activities * * *
 
 
 31
 (5) wetlands enhance the water quality and water supply of the Nation by serving as groundwater recharge areas, nutrient traps, and chemical sinks;
 
 
 32
 (6) wetlands provide a natural means of flood and erosion control by retaining water during periods of high runoff, thereby protecting against loss of life and property;
 
 
 33
 16 U.S.C. Sec. 3901 (1988). Thus, the alleged link is not too speculative to support standing. See also, H.R.Rep. No. 271, 99th Cong., 1st Sess. 86-87, reprinted in 1985 U.S.Code Cong. & Admin.News 1103, 1190-91.
 
 
 34
 The government's argument that redressability is impossible because substantial wetland has already been converted during the pendency of this lawsuit is also rejected. An "identifiable trifle is enough [injury] for standing." SCRAP, 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14; Coalition for the Environment, 504 F.2d at 168. Thus, because appellants allege that their injuries are cumulative it would be error to deny appellants standing simply because they may have already suffered some injury. Redress from additional future injury is sufficient to support standing.
 
 Zone of Interests
 
 35
 The government also argues that appellants lack standing because their interests are not "arguably within the zone of interests to be protected or regulated by the statute." Data Processing Service v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The government asserts, as a matter of law, that only landowners denied benefits under the Swampbuster provisions are within the "zone". We disagree.
 
 
 36
 The Swampbuster provisions, on their face, establish the goal of decreasing the conversion of private wetland into cropland in order to help preserve, for the Nation and its citizens, the beneficial attributes of wetlands. See 16 U.S.C. Secs. 3821-23. See also, H.R.Rep. No. 271 at 86-89, reprinted in 1985 U.S.Code Cong. & Admin.News at 1190-93 ("Wetlands are a priceless resource whose contributions have long gone unrecognized", current rate of wetland destruction is "environmentally unacceptable", Swampbuster provisions will "restrain the decline of our wetland heritage."); 131 Cong.Rec. H12499 (statement of Rep. De La Garza, Dec. 18, 1985), reprinted in 1985 U.S.Code Cong. & Admin.News 2551-52 (Swampbuster provisions are new program to protect "wetlands for future generations."). Appellants' alleged interests "arguably" fit within this zone. They are landowners and inhabitants of the affected area. If their allegations are true they will suffer a loss of aesthetic pleasures associated with wetlands and wetland wildlife, increased contamination of their drinking water, and decreased supplies of ground water and soil moisture for farming purposes. These are among the injuries the bill seeks to avoid. See also, Japan Whaling Assn. v. American Cetacean Soc., 478 U.S. 221, 230-31 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1985).
 
 Conclusion
 
 37
 We find, for the reasons specified above, that appellants have standing to present their claims to the federal courts. We do not take any position on the merits of the claim that the action of the ASCS in granting the exemption was contrary to law.
 
 
 38
 The case is reversed and remanded to the district court for a decision on the merits.
 
 
 
 *
 The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Southern District of Iowa, sitting by designation
 
 
 [1]
 Because we have not reviewed the merits of appellants' claim our reversal is no indication of its merit. Nor have we examined the potential complications that may exist because of the heavily regulated nature of drainage districts in North Dakota