DRUG AND TOILET PREPARATION TRAFFIC CONFERENCE, INC., et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

National Glass Association, National Bus Traffic Association, Inc., Shippers National Freight Claims Council, Inc., Intervenors.

No. 85–1252.

United States Court of Appeals, District of Columbia Circuit.

Argued April 28, 1986.

Decided Aug. 12, 1986.

Daniel J. Sweeney, with whom John M. Cutler, Washington, D.C., was on brief, for petitioners.

Laurence H. Schecker, Atty, Interstate Commerce Commission, with whom Robert S. Burk, General Counsel, Ellen D. Hanson, Associate General Counsel, Interstate Commerce Commission, Robert B. Nicholson and John P. Fonte, Attorneys, Dept. of Justice, Washington, D.C., were on brief, for respondents.

Fritz R. Kahn, with whom William C. Evans, Washington, D.C., and Charles A. Webb, Arlington, Va., were on brief, for intervenor, National Bus Traffic Ass'n, Inc.

Jerald A. Jacobs, Washington, D.C., was on brief for intervenor National Glass Ass'n.

William J. Augella entered an appearance for intervenor Shippers Nat. Freight Claims Council, Inc.

Before BORK and STARR, Circuit Judges, and GESELL[*], District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

We are called upon to determine whether the Interstate Commerce Commission properly approved a proposal by the National Bus Traffic Association to allow its members to transport windshields and window

---

[*] Sitting by designation pursuant to Title 28, U.S.C. § 292(a).

glass without assuming liability for loss or damage occasioned during shipment. Under the deferential standards of review applicable in these circumstances, we uphold the Commission's determination.

I

The National Bus Traffic Association (NBTA) is a collective ratemaking bureau which, we are told, consists of all major bus carriers. Prior to 1980, bus companies transported automobile windshields and window glass via their express services. In September 1980, however, the NBTA membership voted to stop accepting these items for shipment due to the rising incidence of losses incurred in connection with this traffic. A tariff amendment incorporating this agreement among the bus companies was filed with the Commission on November 20, 1980, and took effect on January 5, 1981. No one protested this action. Nor was any complaint thereafter filed with the ICC challenging the embargo.

■ Subsequently, at the urging of the National Glass Dealers Association (Glass Dealers), the NBTA voted to lift the embargo on the condition that the carriers would be exempt from any liability for loss or damage. The agreement to this effect between the Glass Dealers and NBTA was embodied in a "released valuation" proposal filed with the Commission on February 17, 1983. We pause to observe that in transportation regulation parlance, "released valuation" refers to an agreed level of liability assumed by a carrier in transporting products; the rate charged by a carrier whose liability is thus limited is known as a "released rate." Under the

experimental, two-year proposal submitted by NBTA, automobile windshields and window glass would be assigned a "zero released valuation" and would be carried at a "zero released rate." NBTA's proposal, however, sought approval only for the zero released valuation concept; it did not seek approval of any particular rate. *See* Appendix (App.) at 3, 11–12. Accordingly, ICC approval of the proposal would not, by itself, have lifted the NBTA embargo.

The application was opposed by the petitioners here, the Drug and Toilet Preparation Traffic Conference and the National Small Shipments Traffic Conference, some of whose members ship automobile windshields and window glass.[1] Their principal objection was that the proposal would improperly relieve carriers of common-law and statutory liability for loss or damage.

Notwithstanding petitioners' objections, the NBTA proposal was approved by Division 2 of the Commission. *National Bus Traffic Association, Inc., Automobile Windshields and Window Glass*, 367 I.C.C. 691 (1983) (*September 1983 Decision* ), *reprinted in* App. at 49. The panel held that the released valuations set forth in the proposal were "reasonable under the circumstances surrounding the transportation" within the meaning of the applicable statute. 49 U.S.C. § 10730(a).[2] 367 I.C.C. at 694–97. The panel "stress[ed] ... that [its decision] is limited to the unique facts of this case" and imposed a two year term on the authority granted. *Id.* at 697. The full Commission denied petitioners' administrative appeals. *See* App. at 85 (*August 1984 Decision* ). The challengers' petition to reopen was thereafter denied. *See* J.A. at 115 (*March 1985 Decision* ). In that

---

1. NBTA's proposal was and continues to be supported by the Glass Dealers. NBTA's application was initiated at the request of the National Glass Dealers Association as a means for "reestablishment of service by bus express carriers." *Automobile Windshields*, 367 I.C.C. 691, 692 (1983). The Glass Dealers represented to the ICC that recent innovations in packaging had prompted the shippers to accept the full risk of loss or damage in return for lifting the embargo on this low-cost service.

2. That section provides in relevant part:

   The Interstate Commerce Commission may require or authorize a carrier ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.

   49 U.S.C. § 10730(a) (1982).

decision, the Commission, responding to an additional argument advanced during the administrative appeal, held that NBTA's proposal did not constitute illegal collective ratemaking inasmuch as the proposal concerned only a condition of service, not rates.

In November 1983, soon after the Commission panel's initial approval of the tariff in the *September 1983 Decision,* the NBTA filed an amended tariff under which rates for automobile windshields and window glass were set at pre-embargo levels, subject to the zero released value. *See* App. at 131. This filing effectively ended the embargo. The rate tariff did not, however, set forth any rates for shipments at full value. Almost two years later, after its proceedings with respect to NBTA's released valuation proposal were complete, the Commission initiated an investigation of the rate tariff (and the tariffs succeeding it) to determine whether its promulgation did in fact constitute illegal collective ratemaking. On April 18, 1986, on the eve of oral argument in this case, the Commission ruled that, although promulgation of the rate tariff constituted collective ratemaking, NBTA's action was nonetheless legal because it fell within a statutory exception to the ban on such ratemaking. *See National Bus Traffic Association, Inc.,* Slip Op. at 3–5 (Amendment No. 2 Released Rate Decision No. MC–976, decided April 18, 1986). That decision, we should emphasize, is not before us for review.

Rather, petitioners challenge the Commission's approval of the earlier, released valuation proposed embodying the agreement between the Glass Dealers and NBTA. They do so in two respects. First, they attack the ICC's determination that the proposal was "reasonable" within the meaning of the applicable statute, contending that (a) the Commission is without authority to authorize a re-released valuation of zero and (b) the NBTA's lifting of its embargo constitutes an insufficient *quid pro quo* for the released valuation. Second, petitioners renew their contention that NBTA's proposal constituted collective ratemaking and therefore violated the statutory ban on such ratemaking, 49 U.S.C. § 10706(b)(3)(E).[3]

## II

The Commission expressly determined that the released valuation proposal is "reasonable under the circumstances surrounding the transportation" within the meaning of 49 U.S.C. § 10730(a). We are therefore confronted, in effect, with an agency's interpretation of a statute which it is charged with administering. Under settled principles, the judiciary may overturn such an interpretation only if it is contrary to Congress's clear intent, or, in the event Congress has not spoken to the precise issue, if the agency's interpretation is unreasonable. *See, e.g., Japan Whaling Association v. American Cetacean Society,* — U.S. —, 106 S.Ct. 2860, 2867–72, 92 L.Ed.2d 166 (1986); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–46, 104 S.Ct. 2778, 2781–84, 81 L.Ed.2d 694 (1984). An agency's specific

**3.** That statute provides in relevant part:

[N]o agreement approved under this subsection may provide for discussion of or voting upon any single-line rate proposed by a motor common carrier of passengers. ... [N]o agreement approved under this subsection may provide for discussion of or voting upon any joint rate proposed by one or more motor common carriers of passengers.... This subparagraph ... shall not apply to the following:
(i) any general rate increase or decrease, broad change in tariff structure, or promotional or innovative fare change, as defined by the Commission and subject to such notice requirements the Commission may specify by regulation, if discussion of such general increase or decrease is limited to industry average carrier costs and intermodal competitive factors and does not include discussion of individual markets or particular single-rates or joint rates; and
(ii) publishing of tariffs, filing of independent actions for individual member carriers, providing of support services for members, and changes in rules or regulations which are of at least substantially general application throughout the area in which such changes will apply.

49 U.S.C. § 10706(b)(3)(E).

application or implementation of its statutory interpretation may be overturned only if the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982).

### A

■ The pivotal issue before us is whether the Commission's interpretation of the statutory term "reasonable" as permitting zero released rates is consistent with Congress' intent. As the Commission rightly observed, "there is nothing in the applicable statute that prohibits zero liability." *September 1983 Decision*, App. at 694. To the contrary, the statute speaks in terms of a broad grant of authority to the Commission to permit limited value rates. *Id.; see supra* note 2. The Commission put it well in its first decision: "[T]he Commission has the statutory authority to approve *any* reasonable arrangement." App. at 53 (emphasis in original).

Moreover, the legislative history of the enactment falls far short of showing "with sufficient clarity that the agency construction is contrary to the will of Congress." *Japan Whaling Association*, 106 S.Ct. at 2868 (citations omitted). Indeed, the legislative history of the measure strongly suggests Congress' understanding that zero released rates were permissible. The House Report discussing the concept of released valuation stated as follows:

> Released rates, in effect, allow the shipper to pay a lesser price for hauling the goods and a separate agreed-upon price for whatever amount of insurance the shipper desires. Consequently, if the commodities are of low value or if the shipper wants to take the risk, *the shipper may want only partial insurance or none at all.* Having this option should reduce the total price the shipper must pay for the transportation. The Committee intends that this change in

the law foster more competition in the pricing of transportation service.

H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 25–26 (1980), U.S.Code Cong. & Admin. News 1980, 2283, 2307, 2308 (emphasis added).[4] By acknowledging the possibility that freight might not be insured at all under a system of released rates, the House Report made explicit the assumption that zero released valuation could be permitted. While the House Report focused on the shippers' desires, as opposed to the carriers' imposition of terms and conditions, the fact remains that this passage contemplated a flexible system of released rates which would embrace no insurance at all, that is to say a released rate of zero.

Petitioners suggest that the House Report's reference to shippers not wanting any insurance was meant only to describe the possibility that some shippers might not wish to purchase any *additional* insurance over and above that provided at a usual (non-zero) released value rate. We disagree. If a shipper ships at a full-value rate, it is purchasing full insurance; if it ships at a released value rate and the released value is larger than zero, then the shipper is purchasing "partial insurance"; only if the shipper agrees to a zero released value and ships at a zero released rate does the shipper in effect purchase no insurance at all. *See Shippers National Freight Claim Council, Inc. v. ICC*, 712 F.2d 740, 749–50 (2d Cir.1933), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3524, 82 L.Ed.2d 839 (1984).

Petitioners also argue that, "[i]f Congress intended to enact a law which completely withdrew the carrier's common law liability as a bailee, then it would have to use words plainly connoting that new concept...." Petitioners' Brief at 28. But it is obvious from the statute that Congress intended to confer upon the Commission the authority to determine when and to

---

**4.** Petitioners assert that this discussion applies only to section 10730(b), which applies to carriers of property, not to 10730(a), which applies to motor carriers of passengers and under which NBTA's proposal is to be evaluated. From the context in which this discussion appears, however, the Report's analysis appears to relate to the released valuation generally, not simply to the provisions of section 10730(b) alone.

what extent a carrier's common-law liability could be modified. As we have seen, the statute does not by its terms rule out any level of released rate; it imposes, instead, a standard of reasonableness to guide the Commission, with due regard to "the circumstances surrounding the transportation." 49 U.S.C. § 10730(a). We find not the slightest support for petitioners' assertion that section 10730 was intended merely to codify the common-law principle that when a shipper declares its freight to have a certain value in order to obtain a lower rate, it may not later seek to recover a greater value. This interpretation seems especially odd in view of the House Report's statement that this change in law was designed to foster price competition. Codification of a common-law rule would seem, at best, only tangentially related to a policy goal of reducing regulatory restraints in the transportation marketplace so as to promote competition.

■ But even if we were to agree that Congressional intent is unclear, we would still be obliged to uphold the Commission's statutory interpretation under *Chevron* principles. *See, e.g., Japan Whaling Association,* 106 S.Ct. at 2867–68; *United States v. Riverside Bayview Homes, Inc.,* — U.S. ——, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985). Contrary to petitioners' belief, the Commission in interpreting the statute is not bound by the common-law principle that a carrier may only *limit* its liability, rather than exempt itself from liability altogether. *See, e.g., Adams Express Co. v. Croninger,* 226 U.S. 491, 509–12, 33 S.Ct. 148, 153–54, 57 L.Ed. 314 (1913) (setting forth the common-law rule). As this court has previously stated, it is up to the Commission to determine "what exceptions to carrier liability *beyond those at*

*common law* are dictated by national transportation policy." *Household Goods Carriers' Bureau v. ICC,* 584 F.2d 437, 441 (D.C.Cir.1978) (emphasis added). The common law does not define the metes and bounds of the national transportation policy, especially in the wake of the far-reaching changes wrought by Congress in recent years with respect to the regulatory structure governing transportation services. The Commission could reasonably conclude that it would be curious in the extreme to permit very nominal released values (as permitted under such old cases as *George N. Pierce Co. v. Wells Fargo & Co.,* 236 U.S. 278, 35 S.Ct. 351, 59 L.Ed. 576 (1915) (upholding released value of $50 per express shipment even though loss was valued at $20,000)) while absolutely forbidding zero reduced value. *See* 367 I.C.C. at 695.[5] In addition to avoiding formalistic distinctions, the Commission's interpretation was based on the policy prediction that, even in a regime of zero liability, competition among carriers would "spur the carriers" to handle the products with care. *Id.*[6] We in the judiciary are singularly ill-equipped to second-guess that marketplace prediction by the agency charged by Congress with making such determination.

### B

In their second line of attack, petitioners contend that the lifting of NBTA's embargo does not constitute a sufficient *quid pro quo* for the released value rates. Petitioners appear to argue that the Commission's finding of an adequate *quid pro quo* was both contrary to Supreme Court precedent and arbitrary and capricious.

According to the Commission, the *quid pro quo* requirement derives from the case of *New York, N.H. & H.R. Co. v. Nothnagle,* 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed.

---

**5.** In its *September 1983 Decision,* the Commission Division observed that NBTA, in response to protests, had indicated its willingness to make shipments subject to "a nominal released value, such as $5 per shipment." App. at 49.

**6.** Petitioners' attack on this portion of the Commission's reasoning is based upon a misinterpretation of the Commission's decision. They interpret the Commission to be saying that a *zero liability on glass* will "spur the carriers to

ensure security," *see* Petitioners' Brief at 25, when in fact, as stated in the text, the Commission was referring to competitive incentives to ensure security.

In addition, we are told that glass products are not infrequently shipped with other products which are not the subject of zero released rates, thus providing another incentive for careful handling of those products.

1500 (1953). *Nothnagle* involved a 1915 statute that nullified most contractual limitations on the liability of railroads for loss and damage. The issue before the Court was whether a particular limitation of liability (for baggage transported by a rail carrier) fell within a narrow exception for property transported pursuant to a tariff establishing "rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, ..." *See* 346 U.S. at 131–32, 73 S.Ct. at 988. In light of that setting, the Supreme Court stated: "Only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained." *Id.* at 135, 73 S.Ct. at 990; *see* 367 I.C.C. at 686.

■ Petitioners contend that, to be consistent with *Nothnagle*, the Commission should have required NBTA to maintain a full value rate in addition to its lower released value rate. The Commission held,

however, that while *Nothnagle* requires some sort of *quid pro quo*, the specific language which we have just quoted was inapposite to the circumstances here. The reason is that *Nothnagle* was dealing with a common carrier obliged (absent an enforceable agreement to the contrary) to carry the commodity at full value. *Id.* at 696–97. In contrast, bus companies are under no general common carrier obligation to transport glass products.[7] Relying upon this distinction, the Commission concluded that the *quid pro quo* requirement had been met because, "in exchange for zero released value, NBTA carriers are offering to transport a commodity which they are not currently required to carry." *Id.* at 697. We see no error in this analysis. And, in any event, *Nothnagle* did not purport to erect a general requirement that any carrier seeking to carry cargo at less than full value must offer multiple rates depending upon the declared value.[8]

■ Petitioners next argue that the NBTA's agreement to lift its embargo cannot constitute an adequate *quid pro quo*

7. We note, as the Commission emphasized, that bus carriers are common carriers of passengers, not general freight. *See e.g., National Bus Traffic Ass'n, Inc. v. ICC,* 613 F.2d 881, 884 (D.C.Cir. 1979) ("carriage of express is incidental to the primary responsibility of bus companies to transport passengers"). It would thus appear to follow that bus carriers have no general obligation to accept all freight tendered to them for shipment. In any event, that is the Commission's interpretation of the carriers' obligations, and that interpretation seems to us eminently reasonable.

8. Although the Commission did not expressly rely on it, we note an additional reason why the *Nothnagle* language need not be applied literally in these circumstances. Unlike the statute at issue here, the statute in *Nothnagle,* in referring to "rates dependent upon the value declared ... by the shipper," seems to have contemplated the type of rate structure petitioners argue is required here. *See* 346 U.S. at 131–32, 73 S.Ct. at 988. Hence, even if petitioners have correctly interpreted the *Nothnagle* language, that language reflects the unique features of the statute the Court had before it for analysis. In addition, the statute before us specifically provides that "the Commission *may* require" carriers to offer full liability rates in addition to released liability rates. 49 U.S.C. § 10730(b)(2) (emphasis added). Congress, then, did not appear to

contemplate that carriers would automatically be required to offer full value rates.

*Union Pac. R. Co. v. Burke,* 255 U.S. 317, 41 S.Ct. 283, 65 L.Ed. 656 (1921), also relied upon by petitioners, is not controlling. In that case, the Supreme Court's conclusion that a "choice of rates was essential to validly [released] agreements," *id.* at 321, 41 S.Ct. at 284, was based on the Court's reading of federal common law; it was not an interpretation of the statutory provision at issue here.

Nor do we regard this court's opinion in *National Motor Freight Traffic Ass'n, Inc. v. ICC,* 590 F.2d 1180 (D.C.Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979), as imposing such a requirement. To be sure, petitioners point to language in that opinion stating that "carriers must make available to shippers two rate schedules—one for shipments where the carrier assumes full liability, and one containing lower rates for shipments under the released value provision." *Id.* at 1182. This statement, however, appears in the opening paragraph of the background section of the opinion and indicates only the court's understanding of the regulatory scheme as it then existed; it does not purport to be a definitive interpretation of the statute at issue here. Indeed, the only holding in that case was that the Commission's interpretation of a liability-limiting provision in a carrier's contract was not arbitrary or capricious. *See id.* at 1184–87.

because the embargo was illegal in the first place. The Commission responded to this attack by observing that the NBTA had "sought and received approval to cancel its tariffs" for automobile windshields and window glass in early 1981, and that "[n]o protests were filed in the course of that proceeding." 367 I.C.C. at 696. In essence, the Commission determined that the present proceeding was not the appropriate forum for challenging the legality of the embargo.

We discern nothing arbitrary or capricious in that determination. It is undeniable that petitioners were at liberty to challenge the embargo at the time it was adopted by the NBTA or indeed at a later time by filing a complaint. *See* 49 U.S.C. § 10708(a)(1) (interested party may apply to Commission requesting determination of lawfulness of proposed rate, classification, rule, or practice); *id.* § 11701(b) (interested person may file complaint alleging violation of subtitle). That petitioners may have been unaware of the embargo is irrelevant in law. Actual knowledge of a filing is unnecessary. A shipper is charged with notice of the terms and conditions—including those affecting liability—contained in a tariff filed with the Commission. *See American Railway Express Co. v. Daniel,* 269 U.S. 40, 42, 46 S.Ct. 15, 15, 70 L.Ed. 154 (1925).

In addition, petitioners have cited no authority to the effect that the Commission is obligated to inquire into the legality of an embargo when determining whether lifting the embargo is a sufficient *quid pro quo.* We see no basis for judicial imposition of such a requirement, when an avenue of direct attack upon the embargo was available to petitioners.[9] In our view, the Commission acted reasonably in refusing to allow petitioners, in effect, to collaterally attack the NBTA embargo during proceedings designed to determine the lawfulness of the NBTA's released valuation proposal.

## III

In their final challenge to the agency's action, petitioners contend that promulgation of the released valuation proposal constituted collective ratemaking and therefore ran afoul of 49 U.S.C. § 10706(b)(3)(E). *See supra* note 3. That provision prohibits agreements that "may provide for discussion of or voting upon any single-line rate proposed by a motor common carrier of passengers."[10] Emphasizing that the NBTA proposal itself set forth no rates, the Commission determined that the proposal was not about rates at all, but a condition of service—the liability assumed by a carrier for loss or damage to transported products. The Commission thus interpreted the statutory ban of collective ratemaking as not applying to the proposal at issue here. *See March 1985 Decision,* App. at 117.

Petitioners appear to contend that the Commission's treatment of this issue rested upon an erroneous factual predicate. According to petitioners, the Commission ignored two facts: (1) that the NBTA on November 21, 1983 (shortly after the Commission panel's initial decision) filed a tariff establishing *rates* for automobile windshields and window glass at pre-embargo levels; and (2) that "the zero liability proposal was [made] in conjunction with the vote of the carriers to reestablish the [former] express rates." Petitioners' Brief at 32.

Although the Commission's *March 1985 Decision* stated that "no rates are currently in effect for the involved glass products," *see* J.A. at 117, the Commission's ultimate resolution of this proceeding did not, as we read its three opinions, rest upon that passing observation. Rather, the Commission held that NBTA's promulgation of the released valuation proposal did not involve "discussion of or voting up

---

9. The cases relied upon by petitioners in which the Commission has previously found such embargos unlawful are therefore inapposite. *See, e.g., Prohibitions and Limitations on Shipment of Articles,* 355 I.C.C. 793 (1977).

10. A single line rate, according to petitioners, "applies from origin to destination via one carrier, without interchanging with another carrier." Petitioners' Brief at 5 n. * *.

on any single-line rate" within the meaning of the statutory ban.

Absent any indication that the Commission's interpretation of the collective ratemaking statute is contrary to clear Congressional intent, we must uphold the ICC's interpretation as long as that interpretation is reasonable. *See, e.g., Chevron,* 467 U.S. at 842–46, 104 S.Ct. at 2781–84. We believe that it is. The only proposal before the Commission was the released valuation proposal. As we have seen, that proposal, unlike the rate tariff of November 21, 1983, (which, again, is not before us for review) set forth no rates. The Commission could therefore sensibly conclude that NBTA had not engaged in collective ratemaking in promulgating this proposal, while reserving that question for resolution in the separate rate tariff filed after the formulation and filing of the released rate proposal.

For the foregoing reasons, the petition for review is

*Denied.*