In re Michael E. CUMMINGS, Debtor.

Diane L. CUMMINGS, Plaintiff,

v.

Michael E. CUMMINGS, Defendant and Third Party Plaintiff,

v.

BANKWEST and the Small Business Administration, Third Party Defendants.

Bankruptcy No. 91–30076.
Adv. No. 92–3002.

United States Bankruptcy Court, D. South Dakota, C.D.

Nov. 3, 1992.

See also 147 B.R. 747.

Robert Riter, Jr., Pierre, S.D., for plaintiff.

James Carlon, Pierre, S.D., for 3rd party plaintiff.

Brent Wilbur, Pierre, S.D., for BankWest.

Thomas Lloyd, Pierre, S.D., for SBA.

## MEMORANDUM OF DECISION RE: THIRD PARTY COMPLAINT FOR DETERMINATION OF CLAIM

IRVIN N. HOYT, Chief Judge.

The matter before the Court is the third-party complaint brought by Debtor Michael E. Cummings against BankWest and the Small Business Administration for a determination of the lenders' claim against the estate. This is a core proceeding under 28 U.S.C. § 157(b)(2). This ruling shall constitute findings and conclusions as required by F.R.Bankr.P. 7052.

## I.

Michael E. Cummings, a fishing tackle, marine supply, and sporting goods wholesaler doing business as Cummings Sport Supply, borrowed $168,000.00 from BankWest on October 15, 1986. The Small Business Administration (SBA) guaranteed 64% of the debt. As partial security for that debt, Michael E. Cummings and his wife Diane L. Cummings gave a second mortgage on their family home at 501 North Spruce Street, Pierre, South Dakota. Michael E. Cummings also gave as security:

a. All equipment and machinery, including power-driven machinery and equipment, furniture and fixtures, including buildings now owned or hereafter acquired, together with all replacements thereof, all attachments, accessories, parts and tools belonging thereto or for use in connection therewith.

b. All passenger and commercial motor vehicles registered for use upon public highways or streets, now owned or hereinafter acquired, together with all replacements thereof, all attachments, accessories, parts, equipment and tools belonging thereto or for use in connection therewith.

c. All inventory, raw materials, work in process and supplies now owned or hereinafter acquired.

d. All accounts receivable now outstanding or hereafter arising.

e. All contract rights and general intangibles now in force or hereafter acquired.

An Exhibit A and a Schedule 1 attached to the security agreement more fully set itemized the property given as security.

On May 24, 1989, Michael E. Cummings and Diane L. Cummings were divorced. Under a settlement entered into that day, Diane L. Cummings received the home and undertook the first mortgage on it. Michael E. Cummings received the business property and associated debt and agreed to have the second BankWest mortgage on Diane L. Cummings' home removed by December 31, 1989.

In January, 1990, BankWest, without notice to SBA or Diane L. Cummings, released its lien on certain vehicles that secured the business loan to Michael E. Cummings so that he could seek additional business financing elsewhere. By July, 1991, Michael E. Cummings was in arrears on his SBA guaranteed business loan from BankWest. The second mortgage on the house remained in place.

On July 29, 1991, Andrew D. McKay, Assistant Vice President at BankWest, and Jack Lynass of SBA inspected Michael E. Cummings' business inventory. Michael E. Cummings estimated the inventory held that day was worth about $100,000.00. Andrew D. McKay and Jack Lynass concurred that the shelves looked empty or sparsely stocked. Subsequent to that inspection, the three parties generally discussed some options, including a self liquidation by Michael E. Cummings, a bulk sale of the inventory, or a sale of the business itself. At the conclusion of these talks, it was Michael E. Cummings' understanding that any claim that BankWest or SBA had against him or Diane L. Cummings' home would be satisfied if he turned over the business inventory. Neither Andrew D. McKay of BankWest nor Neil McIntyre, a twelve-year loan specialist with SBA, recalled that they personally agreed to waive BankWest and SBA's mortgage on Diane L. Cummings' home in their discussions with Michael E. Cummings.

Upon advice of counsel, BankWest informed Michael E. Cummings by letter dated July 29, 1991 that he had until August 19, 1991 to bring current past due payments of $11,504.00 or collection proceedings against secured property could commence. The letter, signed by Assistant Vice President Andrew D. McKay, stated the principal balance was $84,786.93, the interest due was $5,025.98, and the daily interest accrual was $25.91. The letter was copied to Diane [L.] Cummings and "Chuck Schroder—SBA."

On August 5, 1991, Andrew D. McKay and Chuck Schroder inspected the inventory again. Michael E. Cummings was not present. Andrew D. McKay's loan file notes for that day state, "Although it is difficult to determine the value of the in-

ventory, Mr. Schroder expressed his concern as to whether it would cover the current debt...." BankWest moved the note to "non-accrual" status on August 13, 1991.

On August 20, 1992, Andrew D. McKay again wrote to Michael E. Cummings. The letter confirmed that Michael E. Cummings was to consult with an attorney and respond to a proposal made by Neal McIntyre and Andrew D. McKay. The letter also stated:

> Included in that proposal was a request that you not sell any more inventory (with the exception of live bait) and that you give to BankWest and the SBA possession of that collateral by the end of this week. In addition we would like to have a list of your accounts receivable which will be collected by BankWest and credited towards your note. Other furniture, fixtures, and equipment (with the exception of the live bait coolers and tanks for the time being) will also need to be turned over to BankWest and the Small Business Administration.

Michael E. Cummings, Andrew D. McKay, and Craig M. Hilton, a senior vice president at BankWest, met at the bank on August 22, 1991. Michael E. Cummings informed the bank officials that he had decided to turn over his business inventory. Craig M. Hilton and a bank janitor went that day to the Cummings Sport Supply building at 1903 East Dakota Avenue in Pierre, South Dakota to secure the inventory. Michael E. Cummings was also present. The bank officials consolidated items from the front of the building, where a live bait shop was located, with the warehoused goods in the back and put a padlock on the warehouse portion. The live bait tanks and cooler items located in front were left as is because Michael E. Cummings and the bank officials had agreed that Michael E. Cummings could operate the bait shop through Labor Day.

Michael E. Cummings and the BankWest and SBA officials did not specifically discuss the status of the home mortgage when he turned over the business inventory. Michael E. Cummings did not expect or receive a written claim waiver or mortgage satisfaction from BankWest.

A few days after BankWest secured the inventory, a bank official asked Michael E. Cummings if he knew of anyone interested in purchasing the inventory in bulk. Michael E. Cummings told them he knew of no one. Michael E. Cummings admitted he was not eager to help BankWest because he thought his now soured business dealings with BankWest were done.

On August 23, 1992, Andrew D. McKay took Errol Peterson, the general merchandise manager of Dakotamart, a large local retailer of fishing tackle and other outdoor sporting goods, and Greg Pauley of Quick Change Systems, a local tackle manufacturer, to the warehouse. According to loan file notes made by Andrew D. McKay, Errol Peterson and Greg Pauley took a "quick look" at the inventory that day and "agreed to conduct a more thorough inventory check with Craig M. Hilton sometime next week." No other prospective buyers were contacted by BankWest. On August 28, 1992, BankWest officials accepted a bulk sale offer of $3,100.00 from Dakotamart for the warehouse inventory. The sale to Dakotamart was negotiated before a more thorough inventory was taken by the seller or any potential buyer.

At the time of BankWest's sale to Dakotamart, Michael E. Cummings knew only that BankWest was looking for bulk buyers. Diane L. Cummings did not receive notice of the proposed sale to Dakotamart.

Michael E. Cummings presented Mike Schaefer to BankWest as a potential buyer of the bait shop equipment. With Michael E. Cummings' and SBA's consent but without notice to Diane L. Cummings, BankWest sold the live bait, tanks, and related equipment that were in the front of the warehouse to Mike Schaefer for $500.00.

Craig M. Hilton asked Michael E. Cummings to sign two bills of sale prepared by SBA to "speed the process ... so that [the buyers] could take possession of the property." The first bill of sale, dated September 3, 1991, sold "ALL INVENTORY OF CUMMINGS SPORT SUPPLY" to Dakotamart of Pierre, Inc., for $3,100.00. The second,

also dated September 3, 1991, sold to Mike Schaefer for $500.00 the remaining business property consisting of "SHELVES, TANKS, DESKS, WALK-IN COOLERS, CHAIRS, SUPPLY CATALOGS AND PEG BOARDS." Michael E. Cummings signed the bills of sale because he thought he had to do so. Dakotamart never received the bill of sale for the goods it purchased.

After the business equipment and inventory sales in early September, 1991, the only remaining collateral for Michael E. Cummings's business note with BankWest was Diane L. Cummings' home. To protect her home from impending foreclosure, Diane L. Cummings pursued enforcement in state court of her divorce settlement with Michael E. Cummings. Those efforts stopped October 21, 1991 when Michael E. Cummings (Debtor), doing business as Cummings Sport Supply, filed a Chapter 7 petition.

Among his secured creditors, Debtor listed BankWest for $84,786.93 for a business operating loan and SBA as a guarantor of the BankWest loan. Among his unsecured creditors, he listed Diane Cummings for $40,000.00 for a "divorce/property settlement." On December 16, 1991, Debtor amended his schedules to state that the debt to BankWest and SBA was now disputed.

Chapter 7 Trustee John S. Lovald filed a report that the case had no assets on January 22, 1992.

On February 3, 1992, Debtor amended his Chapter 7 Statement (Schedule B–20) to include a claim of an unknown amount against BankWest and SBA.

On February 11, 1992, Diane L. Cummings filed a complaint under 11 U.S.C. § 523(a)(5). She alleged that Debtor's responsibility, pursuant to the couple's 1989 divorce settlement, to remove the second mortgage on her home was a nondischargeable support obligation. Debtor answered the complaint on March 10, 1992. He sought dismissal of the complaint and stated that his assumption of the second mort-

gage was in the nature of a property settlement and, therefore, dischargeable.[1]

Debtor also brought a third-party complaint against BankWest and SBA. He alleges that when he defaulted on the business loan and BankWest seized the secured inventory, the bank failed to sell the goods in compliance with the Uniform Commercial Code. Therefore, he argues, BankWest and SBA waived any claim to a deficiency. Further, Debtor contends BankWest and SBA's actions damaged him in an unknown amount. He requested a jury trial on these issues.

BankWest answered the third party complaint on March 23, 1992. It argues this Court does not have jurisdiction to award money damages; that Debtor has no interest in bringing this action because it belonged to the case trustee; and that Debtor has waived any claim against BankWest because he acquiesced to the sale of the inventory secured to BankWest and SBA.

SBA answered on April 16, 1992. It argues that the United States has "absolute sovereign immunity and has not waived such immunity"; that Debtor is not the real party in interest; and that Debtor, not BankWest or SBA, sold the secured property.

BankWest filed a motion for summary judgment on May 5, 1992. A hearing on that motion was held June 9, 1992. The motion was denied by Order entered June 12, 1992 because material facts were disputed.

On July 13, 1992, Debtor withdrew his request for a jury trial.

A joint trial on Diane L. Cummings' nondischargeability complaint and Debtor's third party complaint for a determination of BankWest and SBA's claim was held July 27 and 28, 1992. Appearances included Robert C. Riter, Jr., and Jerry L. Wattier for Diane L. Cummings, James E. Carlon for Debtor, Brent A. Wilbur for BankWest, and Assistant U.S. Attorney

---

1. Diane L. Cummings' nondischargeability complaint is addressed in a separate memorandum decision and order of this Court.

Thomas A. Lloyd for SBA. Trustee Lovald did not participate.

Debtor's debt to BankWest/SBA on August 29, 1991 (after the sales to Dakotamart and Mike Schaefer) was $84,786.93 plus interest of $5,774.80 ($25.50 daily accrual).[2] At trial, neither the current value of Diane L. Cummings' home nor the exact amount of the first mortgage on it was established. Consequently, the amount of the claim that BankWest and SBA may make against Debtor's bankruptcy estate or Diane L. Cummings' home was not established.[3] The evidence presented did, however, show that the equity in Diane L. Cummings' home is substantially less than the balance on Debtor's note with BankWest/SBA.

On the January 28, 1990 financial statement for BankWest, Debtor valued his business inventory (tackle and ammunition) at $400,080.00 and his business and office equipment at $33,800.00. Debtor made an itemized year-end inventory in 1990. The inventory's value at that time was stated to be $97,245.41. Another inventory was never made. Neither Debtor nor BankWest was able to supply an accurate inventory of the secured property or its value—wholesale or retail—when BankWest locked the warehouse. Debtor opined that the value of the inventory on August 22, 1992 was around $100,000.00. He said a sale of the inventory in Pierre should have garnered $50,000.00. Debtor said $100,000.00 could have been obtained if several buyers from more densely populated areas in neighboring states, such as Minneapolis, had been contacted. He stated this was true because his inventory contained tackle designed to satisfy markets other than Pierre and South Dakota. Debtor testified that August was a very poor month to market the inventory because retail sales of fishing tackle would be slow until the following spring.

2. An SBA official testified that the loan balance at the time of trial was principal of $81,671.93, interest of $13,808.64 (daily interest accrual of $24.61).

3. Since this is a no asset case, creditors have not been permitted to file proofs of claim. Local Bankr.R. 210.

Craig M. Hilton of BankWest also stated that August was a poor month to sell the inventory because retailers would not want to carry it over the winter.[4] He said he went to the most logical buyer in Pierre— Dakotamart—and accepted its offer. Craig M. Hilton acknowledged that the only estimate of value that BankWest had was the offer from the eventual buyer. He also had presumed that Debtor had sold all the "good" inventory before it was turned over to BankWest.

Errol Peterson of Dakotamart said the inventory his store purchased included some ammunition and knives and a substantial amount of "bargain bin" items that sell best at sports shows. He stated that the purchased goods which were "fairly fast sellers" were immediately placed on Dakotamart's shelves. Dakotamart sold a small amount of the Cummings Sport Supply inventory to other dealers. Some was sold as "loss leader" or bargain bin items at sport shows. A small amount was still on hand at the time of trial and was being sold at discount prices. Errol Peterson estimated Dakotamart would gross about $12,000.00 on the Cummings Sport Supply inventory they purchased.

Claude Kelso, a local fishing professional and Greg Pauley's partner in Quick Change Systems, testified that he purchased $200.00 to $300.00 worth of the Cummings Sport Supply merchandise from Dakotamart. He resold it wholesale two to three weeks later for $2,100.00 to $2,300.00 after some sorting and repackaging at a cost of about $200.00. His buyers were three different outlets that sell "tail end [goods] and leftovers" at sport shows for less than wholesale mark-up. Claude Kelso stated he would have bought the Cummings Sport Supply inventory but his partner did not want to buy it. He also said that before he would have paid "real money" for the

4. Craig Hilton's deposition was taken July 22, 1992. The deposition was substituted for testimony at the trial because he was unavailable that day.

goods, he would have taken an itemized inventory. He stated that to maximize the sale of the inventory, a seller needed to hire an appraiser to find the merchandise's peak value. He also said the goods would have sold better in May of the year.

Gary Fiala, a local fishing supply retailer, computed the value of the Cummings Sport Supply inventory for sale to retailers on August 22, 1991 to be $99,192.89 (cost of $71,629.76 plus average wholesale markup of 38.48%). He estimated the cost of Debtor's inventory on August 22, 1991 by taking Debtor's 1990 itemized inventory and then adding Debtor's 1991 purchases and subtracting Debtor's 1991 sales. He used a 1991 wholesale price book as a reference for wholesale prices and to compute the average wholesale markup. Gary Fiala did not inspect the inventory contemporaneously with his valuation; the last time he personally inspected the inventory of Cummings Sport Supply was in 1989 or 1990. Gary Fiala said he would have paid one-half of the wholesale value if the inventory had been offered to him in bulk.[5] Gary Fiala said that a larger recovery by BankWest would have required that sales be made to more than one purchaser over a longer period of time, rather than by a bulk sale.

At the close of Debtor's case, BankWest moved for judgment because Debtor had no standing to bring his complaint and because Debtor had failed to prove damages. SBA moved for judgment because it had not waived its sovereign immunity. The Court reserved ruling on those motions. The matter was taken under advisement at the close of the trial.

## II.

### A. *Debtor's standing.*

■ When Trustee Lovald filed his no asset report, he in essence told interested parties that he found no assets worth pursuing, including any cause of action that Debtor may have against BankWest and

SBA. Although Trustee Lovald received notice subsequent to his no asset report that Debtor had amended his schedules to include the claim against BankWest and SBA, Trustee Lovald has not amended that no asset report. While the estate's interest in the cause of action with BankWest and SBA technically is not deemed abandoned to Debtor until the case is closed, 11 U.S.C. § 554(c), Debtor's interest in preserving the action against BankWest and SBA arose when Diane L. Cummings brought her nondischargeability complaint surrounding the same debt. Judicial economy and the necessity of an expeditious resolution of these matters dictate that both complaints be addressed at this time. Further, neither BankWest nor SBA identified any prejudice to them because the action was brought by Debtor, rather than Trustee. Therefore, the Court concludes Debtor has standing to bring the third party complaint against BankWest and SBA. *See generally National Wildlife Federation v. Agricultural Stabilization and Conservation Service*, 901 F.2d 673 (8th Cir.1990).

BankWest reads the holding of *Vreugdenhill v. Navistar International Transportation Corp.*, 950 F.2d 524 (8th Cir. 1991), too broadly. In *Vreugdenhill*, the court concluded that property not scheduled before the closing of a case may not be deemed abandoned under § 554(c). Here, Debtor has scheduled the claim against BankWest and SBA. Further, nothing in *Vreugdenhill* suggests that this Court may not consider the equitable factors discussed above in allowing Debtor to pursue this action at this time.

### B. *SBA as a necessary party and its waiver of sovereign Immunity.*

■ Based on Debtor's allegations and in light of the sparse evidence presented to the Court about the assignment of Debtor's note with BankWest to SBA or SBA's guarantee of that note, it appears that SBA is not a necessary party to this action.

---

5. Testimony on this point was muddled because the witness appeared to use loosely the terms "cost" and "fair market value". Gary Fiala said he would pay one-half of "that amount" for a

bulk sale but he did not clearly and consistently state what "that amount" was. He most often referred to the wholesale value of Debtor's inventory in 1990.

Debtor conceded that fact at trial. BankWest and SBA can litigate the consequences of the assignment/guarantee between themselves, as necessary. SBA shall be dismissed sua sponte from these proceedings pursuant to F.R.Bankr.P. 7021 and F.R.Civ.P. 21.

The Court declines to rule on whether SBA waived its sovereign immunity.

### C. *Debtor's claim for damages.*

Debtor failed to present any evidence of the damages he suffered by BankWest's alleged failure to sell secured property in compliance with the Uniform Commercial Code. That portion of Debtor's third party complaint, Count II, will be dismissed. Consequently, the issue of whether this Court has jurisdiction to award damages is moot.

### D. *Sale to Dakotamart in compliance with the U.C.C.*

When a creditor sells repossessed collateral, he must do so in a commercially reasonable manner. S.D.C.L. § 57A–9–504. "Commercially reasonable," as discussed by the Uniform Commercial Code, is a broad term of art.

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

S.D.C.L. § 57A–9–507(2) (in pertinent part). The aggregate circumstances in each case—not specific details of the sale viewed in isolation—should be emphasized. *First Bank of South Dakota v. Haberer Dairy & Farm Equipment, Inc.*, 412 N.W.2d 866, 871 (S.D.1987) (citing Rudow, *Determining the Commercial Reasonableness of the Sale of Repossessed Collateral*, 19 U.C.C.L.J. 139, 140 (1986) (cites therein)). The manner and method of sale, time, place, and sale terms are necessary, "interrelated parts of the whole transaction." *Id.*

Section 57A–9–507(1) of the South Dakota Codified Laws provides the remedy if a creditor fails to sell property in a commercially reasonable manner. As that section is interpreted by South Dakota courts, the creditor is not necessarily precluded from receiving a deficiency.

> '[N]oncompliance with the statute gives rise to a presumption in favor of the debtor that the collateral was worth the amount of the outstanding debt at the time of the default and the debtor is freed from any deficiency unless the creditor proves that the fair market value of the collateral was no greater than the sales price[.] ... [W]hen the creditor seeks a deficiency but has failed to sell the goods in a commercially reasonable manner, the debtor is entitled to be credited with the fair market value of the collateral rather than the actual sales price.'

*Wang v. Wang*, 440 N.W.2d 740, 744 (S.D. 1989) (quoting *Ferrous Financial Services Co. v. Wagnon*, 70 Or.App. 285, 689 P.2d 974, 978 (1984) (cites therein)). In other words, if the creditor asserts a deficiency claim after he has sold the collateral, the creditor has the burden to prove that the disposition of the collateral was conducted in compliance with the Uniform Commercial Code. *Haberer Dairy & Farm Equipment*, 412 N.W.2d at 870 (citing *Clark Leasing Corp. v. White Sands Forest Prod., Inc.*, 87 N.M. 451, 535 P.2d 1077, 1080 (1975), which interpreted U.C.C. § 9–504(3) [S.D.C.L. § 57A–9–504(3)]).

If a creditor sells collateral, he must give "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made ... if [the debtor] has not signed after default a statement renouncing or modifying his right to notification of sale." S.D.C.L. § 57A–9–504(3).

'Debtor' means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper. **Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of the chapter dealing with the collateral.**

S.D.C.L. § 57A–9–105(1)(d) (in pertinent part) (emphasis added). If the creditor who sells collateral fails to give proper notice of the sale, the remedy is the same as when the creditor fails to sell collateral in a commercially reasonable manner. S.D.C.L. § 57A–9–507(1). *Wang,* 440 N.W.2d at 742–43.

### III.

■ BankWest's sale of collateral to Dakotamart was not conducted in a commercially reasonable manner.[6] BankWest did not take an inventory of the collateral when it took possession of the goods nor before it made a sale. BankWest did not obtain an appraisal contemporaneous with the sale. Consequently, the bank did not have sufficient information on which to judge the value of any purchase offer. BankWest exerted minimal effort to find potential buyers.

The fact that Debtor signed the bill of sale is of limited consequence. Debtor did not negotiate the sale. Receipt of a bill of sale from Debtor was not a condition of sale demanded by Dakotamart. Debtor signed the bills of sale because he believed he had to and because he thought his turnover of the collateral would fully satisfy his debt to BankWest. There was no evidence that Debtor had anything else to gain by walking away from the collateral.

The facts indicate BankWest also failed to give Debtor prior notice of the sale to Dakotamart on August 28, 1991. He apparently did not learn of the buyer and

terms of sale until the bill of sale was presented for his signature on September 3, 1991. Further, Debtor did not sign after default a statement renouncing or modifying his right to receive notice.

■ Since BankWest's sale of collateral to Dakotamart was not conducted in compliance with the Uniform Commercial Code, the remaining question is what remedy does Debtor have? As noted above, the burden shifts to BankWest to show that the fair market value of the collateral sold to Dakotamart was no greater than the sale price.

BankWest has failed to meet that burden. The Court is not much better informed now about the value of the collateral sold to Dakotamart than when the trial started. The only finding that can be made is that the value of the collateral sold to Dakotamart substantially exceeded the $3,100.00 sale price. In the absence of further reliable evidence, this Court is left with the presumption that the value of the collateral sold to Dakotamart was equal to the outstanding debt. Consequently, BankWest may not assert a deficiency claim against Debtor nor enforce a secured interest in the remaining collateral held by Diane L. Cummings.

An order will be entered in compliance with this Memorandum.

### ORDER DETERMINING CLAIM OF BANKWEST

In compliance with and recognition of the Memorandum of Decision Re: Third Party Complaint for Determination of Claim entered this day,

IT IS HEREBY ORDERED that Defendant Small Business Administration is DISMISSED pursuant to F.R.Civ.P. 21 and F.R.Bankr.P. 7021 as an unnecessary party; and

IT IS FURTHER ORDERED that the motion for judgment made by Defendant

---

**6.** The Court also notes that BankWest failed to give notice of the sales to Diane L. Cummings, the owner of some of the note's collateral. Diane L. Cummings meets the definition of a debtor under S.D.C.L. § 57A–9–105(1)(d) and she had no prior knowledge that BankWest intended to make private sales of collateral to Dakotamart and Mike Schaefer. Debtor's complaint, however, does not rely on this failure in Count I which seeks a declaration that BankWest and SBA may not pursue a deficiency claim.

BankWest at the close of Third Party Plaintiff Michael E. Cummings' case on the grounds that Debtor Michael E. Cummings does not have standing to bring the third party complaint is DENIED; and

IT IS FURTHER ORDERED that the claim of Third Party Plaintiff Michael E. Cummings against Defendant BankWest for damages (Count II) is DISMISSED; and

IT IS FURTHER ORDERED that Defendant BankWest has no deficiency claim against Debtor Michael E. Cummings arising from a note made October 15, 1986 for $168,000.00 plus interest nor any secured claim in a home owned by Diane L. Cummings at 501 North Spruce, Pierre, South Dakota; and

IT IS FURTHER ORDERED that costs shall not be imposed on any party; and

IT IS FURTHER ORDERED that counsel for Third Party Plaintiff Michael E. Cummings may submit to the Court for entry a judgment in conformance with this Order.

So ordered.