**CONSTRUCTION SERVICES OF SAMOA, INC., MORU MANE and SALLIE MANE, Plaintiffs,**

**v.**

**BANK OF HAWAII, TONY'S CONSTRUCTION and SILA POASA, Defendants.**

High Court of American Samoa
Trial Division

CA No. 21-02

June 22, 2004

Before KRUSE, Chief Justice, LOGOAI, Chief Associate Judge, and ATIULAGI, Associate Judge.

Counsel: For Plaintiffs, Charles V. Ala`ilima
For Defendant Bank of Hawaii, Roy J.D. Hall, Jr.
For Defendants Tony's Construction and Sila Poasa, Frederick J. O'Brien

OPINION AND ORDER

Plaintiffs Construction Services of Samoa, Inc. ("CSS"), Moru Mane ("Moru"), and Sallie Mane ("Sallie") (collectively "Plaintiffs") brought the instant action against Defendants Bank of Hawaii ("BOH"), Tony's Construction, and Sila Poasa ("Sila"). Plaintiffs seek damages from

BOH on six counts: (1) conversion; (2) breach of duty to return equipment; (3) breach of duty to notify; (4) breach of duty to account; (5) conversion of funds from bank account; and (6) intentional infliction of emotional distress. Plaintiffs seek damages from Tony's Construction on two counts: (1) conversion; and (2) intentional infliction of emotional distress; and from Sila on these two counts and two additional counts: (1) tortious interference with security agreement; and (2) trespass. Sila and Tony's Construction brought a counterclaim against Plaintiffs for replevin and crossclaims against BOH for: (1) breach of warranty of good title; (2) fraud and misrepresentation; (3) negligence; and (4) indemnity.

On January 28, 2004, we granted BOH partial summary judgment with respect to the breach of duty to return equipment and intentional infliction of emotional distress claims. On this same date, we granted Sila partial summary judgment with respect to the tortious interference and intentional infliction of emotional distress claims against him. Trial was held on the remaining claims on January 29, 2004 and February 2, 2004. All parties and counsel were present at trial.

### Findings of Fact

Plaintiffs operated CSS, a construction company, in American Samoa. Sila was involved with the operations of CSS but eventually left CSS to start his own construction business, Tony's Construction. In September 1998, CSS purchased a used 1995 PC-200 excavator and various other pieces of equipment for $153,050.00 New Zealand dollars.[1] (Ex. 14 at 3). On December 10, 1999, Sila entered into a Security Agreement/Chattel Mortgage with BOH on behalf of CSS. (Ex. 14). The loan was secured by the excavator and certain accessories listed on the invoice attached to the Security Agreement/Chattel Mortgage. (*Id.*) Sila and Moru guaranteed the loan in their individual capacities. (Ex. 39.) Even after Sila left CSS, he remained obligated as a guarantor on the loan.

CSS defaulted on its loan obligations. In April 2001, BOH set off

---

[1] We take judicial notice that the exchange rate on September 9, 1998 (the date of the invoice) was 0.5075 currency units per dollar. Federal Reserve Statistical Release, Foreign Exchange Rates (Weekly) (released Oct. 5, 1998) *available at* http://www.federalreserve.gov. Accordingly, the value of all of the equipment on the date of invoice in U.S. dollars was $77,672.12, with the excavator price at $55,825.00 and the rock breaker price at $16,240.00. Neither party introduced any evidence regarding the exchange rate.

$3,700.55 from the personal joint account of Moru and Sallie and applied these funds to the outstanding loan obligation in order to bring the loan current. (Ex. 17 and 44.) As a result of this setoff, Sallie incurred returned check and vendor fees.

CSS again defaulted on the loan. On August 2, 2001, BOH sent a notice to CSS indicating that CSS was in default and that the full amount of the loan was due by August 14, 2001. (Ex. 30.) CSS made no payments in response to this correspondence. On August 15, 2001, BOH repossessed the excavator and attachments. However, BOH could not repossess the rock breaker because Moru and Sallie claimed it had been stolen. (Ex. 34.) Two days later, on August 17, 2001, BOH sent a notice to CSS notifying them that BOH planned to sell the excavator at a public sale unless the loan was paid in full by August 31, 2001. (Ex. 6.)

During this same period, BOH was in contact with Sila. On August 17, 2001, Sila made a payment to BOH of $8,867.67 and paid EFVJ Trucking and Machinery $1,668.00 for the storage fees. (Ex. 35.) Sila expressed that he wanted to purchase the equipment rather than redeem the loan. At this point, Sila took possession of the excavator. On September 11, 2001, Sila made financing arrangements with BOH for the remaining amount of $30,943.00 in order to purchase the excavator and attachments.[2] (Ex. 37.) BOH secured Sila's and his wife, Falesa's, new loan with the excavator and attachments. (*Id.*) Sila acknowledged BOH was unable to secure possession of the rock breaker and agreed to recover the rock breaker himself. (*Id.*) Sila still does not have possession of the rock breaker. Indeed, in 2002, CSS gave the rock breaker to Vailu'u and Sons in order to satisfy a $10,155.00 debt.

## Discussion

### I. Plaintiffs v. BOH

#### A. Conversion

■ Plaintiffs allege that BOH converted the excavator and attachments by repossessing and releasing them to Sila. "To constitute conversion of a chattel, there must be an unauthorized assumption of the right to possession or ownership." *Andrews v. Mid-Am. Bank and Trust Co.*, 503

---

[2] We acknowledge that there has been conflicting evidence regarding whether Sila purchased the excavator from BOH or redeemed it as the guarantor on the loan. We find the testimonial and documentary evidence, in total, supports a finding that Sila purchased the excavator from BOH. (*See, e.g.,* Ex. 37 (In a financing approval letter to Sila and Falesa Poasa, BOH "extend[ed] [its] best wishes with the purchase of this equipment.").)

N.E.2d 1120, 1122 (Ill. App. Ct. 1987). "Plaintiff must show a tortious conversion of the chattel, a right to the property, and an absolute and unconditional right to immediate possession of the property." *Id.*

With respect to BOH's repossession, it is undisputed that CSS defaulted on its loan, which was secured by the excavator and attachments. Upon default, BOH had the right to repossess the excavator and attachments. The Security Agreement/Chattel Mortgage says that upon default BOH "may take the Collateral without notice to [CSS] and/or require [CSS] to produce the Collateral to [BOH] at a reasonably convenient place." (Ex. 14.) Plaintiffs could not show they had the right to immediate possession of the excavator after their default. As such, BOH had the superior right to possession when it repossessed the equipment. *See, e.g., Taylor v. United Missouri Bank of Kansas City*, 693 F.2d 63, 64 (8th Cir. 1982); *Keller v. La Rissa, Inc.*, 586 P.2d 1017, 1020 (Haw. 1978); *Andrews*, 503 N.E.2d at 1122.

With respect to BOH's subsequent disposition of the excavator and attachments to Sila, Plaintiffs argue that BOH is liable to them for conversion because it could not release the equipment to Sila as a loan guarantor.[3] Because we find that BOH sold the equipment to Sila in a private sale, Plaintiffs' claim that BOH converted the equipment by releasing it to Sila, a loan guarantor, fails.[4]

B. Breach of Notice

Plaintiffs allege that BOH failed to give them proper notice before

---

[3] Plaintiffs argue that Hawaii Revised Statute section 460:9-504(5) stated that if a guarantor came into possession, the transaction was not to be construed as a sale. HAW. REV. STAT. § 460:9-504(5) (current version at HAW. REV. STAT. ANN. § 490:9-618 (West 2003)). This statute was part of the Hawaii Uniform Commercial Code ("UCC"), which has been significantly revised and renumbered. We do not find it necessary to apply the UCC to this case. *See* disc. *infra* at n.5. However, we note that, although Plaintiffs argue that the earlier version of this statute should apply to them, and although we decline to apply any version, the commentary in the revised provision "rejects the view, which some may have ascribed to former section 9-504(5), that a transfer of collateral to a recourse party can never constitute a disposition of collateral which discharges a security interest. Inasmuch as a secured party could itself buy collateral at its own public sale, it makes no sense to prohibit a recourse party ever from buying at the sale." HAW. REV. STAT. ANN. § 490:9-618 cmt. 3.

[4] If we had found that BOH had released the property to Sila as a loan guarantor, BOH also would not be liable to Plaintiffs for conversion. If Sila had redeemed the equipment rather than purchased it, he would have been subrogated to BOH's rights.

disposing of the excavator to Sila. BOH sent notice to Plaintiffs on August 17, 2001 that it intended to publish notice of public sale ten days later and gave Plaintiffs until August 31, 2001 to redeem the collateral. (Ex. 6.) In the meantime, on August 17, 2001, BOH sold the excavator and attachments to Sila.[5]

██ We have said before,

> [i]n the case of secured transactions one incident of [the obligation to exercise good faith] is that a creditor who seizes and sells a thing to satisfy his debt must exercise due diligence to secure a fair price for it. This obligation has been codified by statute in all fifty states; where it does not require a judicial foreclosure or an advertised public sale it at least requires the sale be conducted in accordance with commercially reasonable practices and that there be notice to the mortgagor.

*Dev. Bank of Am. Samoa v. Ilalio*, 5 A.S.R.2d 1, 8 (Trial Div. 1987). Notice "enable[s] the debtor to protect his interest in the property by paying the debt, finding a buyer, or being present at the sale to bid on the property or have others do so, to the end that it be not sacrificed by a sale at less than its true value." 68A AM. JUR. 2D *Secured Transactions* § 653 (1993) (footnotes omitted). Accordingly, we turn to whether BOH provided proper notice of sale to Plaintiffs.

In the Security Agreement/Chattel Mortgage, the parties agreed that reasonable notice was five days. BOH provided notice to Plaintiffs on August 17, 2001 that ten days later it would publish notice for a public sale of the equipment. Then, the very same day, on August 17, 2001, BOH sold the equipment to Sila in a private sale. We find this notice was deficient. *See, e.g., Liberty Bank v. Honolulu Providoring Inc.*, 650 P.2d 576, 580 (Haw. 1982) (declining to determine if notice was reasonable under the UCC and finding that "[b]y the very terms of the note and security agreement, Liberty Bank failed to provide sufficient notice of the action within a reasonable time.").

---

[5] Plaintiffs insist that the notice provisions in Hawaii Revised Statute section 490:9-611(b) apply to their claim. We disagree. American Samoa has not adopted the UCC, and we believe this case can be resolved using common law concepts. However, we do look to the UCC and the cases interpreting it as persuasive authority. *See Pac. Reliant Indus., Inc. v. Amerika Samoa Bank*, 16 A.S.R.2d 57, 60 (Trial Div. 1990) ("While the UCC does not of its own force apply in American Samoa, that is not to say that certain rules embodied in widely adopted uniform codes, such as the UCC, may not otherwise be applicable in the territory when they evince or restate generally accepted principles of law."); *see also Theo H. Davies & Co. v. Pac. Dev. Co.*, 6 A.S.R.2d 5 (Trial Div. 1987).

■ Although "[n]otice and commercial reasonableness are related but independent requirements, . . . [i]f no notice or a defective notice is given, the creditor acts in a commercially unreasonable manner." 68A AM JUR. 20 *Secured Transactions* § 654 (footnotes omitted). We are convinced that BOH's sale to Sila, without proper notice to Plaintiffs, was commercially unreasonable.

Other circumstances surrounding the sale lead us to question its commercial reasonableness. According to the Security Agreement/ Chattel Mortgage, the parties indicated that "obtain[ing] three bids for any Collateral, from any wholesaler or retailer in similar property and sell[ing] such Collateral for cash or credit at the highest bid price" would be commercially reasonable. (Ex. 14.) On August 17, 2001, rather than getting bids or proceeding to a public sale, BOH decided to enter into a private sale with Sila without informing the Plaintiffs. The evidence indicated that the price Sila paid for the equipment was substantially less than the price it was purchased at three years previous. Tasi Scanlon, a BOH representative, indicated that she would only try to get the amount of the outstanding loan obligation at a sale. (Ex. 34 ("[Tasi] also explained to him that regardless of the machines' value, the Bank intends to sell it for an amount to recover the outstanding loan and no more . . . .") The circumstances surrounding the transaction lead us to believe that the private sale of the equipment to Sila without proper notice to the Plaintiffs was commercially unreasonable. *See, e.g., Mercantile Fin. Corp. v. Miller*, 292 F. Supp. 797, 801 (E.D. Pa. 1968); *Reed v. Universal C.I.T. Credit Corp.*, 253 A.2d 101, 103-4 (Pa. 1969).

■ BOH argues that even if it did violate a notice requirement, Plaintiffs have not suffered any recoverable damages under the UCC. Whether in terms of the UCC or common law, we believe Plaintiffs would have been entitled to any surplus from the sale of the equipment.[6] *See, e.g.,* HAW. REV. STAT. ANN. §§ 490:9-625(b), (d) cmt. 3 (West 2003) ("Assuming no double recovery, a debtor whose deficiency is eliminated under section 9-626 may pursue a claim for a surplus."); *id.*, § 490:9-615(f) (discussing how to calculate the surplus); *Willis v. Healthdyne, Inc.*, 382 S.E.2d 651, 653 (Ga. App. Ct. 1989) ("A sale of collateral, even if it is without notice, does not constitute conversion, but a defaulting debtor can recover actual damages '. . . for any loss caused by an inadequate sale price.").

---

[6] Some jurisdictions will find the secured party liable for conversion in the absence of proper notice because the debtor is unable to redeem the equipment. The evidence at trial conclusively established that Plaintiffs made no attempt to redeem nor were they in any position to redeem the equipment.

> Where a security holder, proceeding as permitted by the security instrument, secures possession of the security and sells it at a private forced sale, he should exercise due diligence to get the best price obtainable at such a sale, and if he fails so to do and sells the security for less than he could have obtained by the exercise of such diligence, he is liable to the debtor for the difference between the price obtained and the price he could have obtained by the exercise of such diligence.

*A to Z Rental, Inc. v. Wilson*, 413 F.2d 899, 909 (10th Cir. 1969); *see also Bank of Hawaii v. Davis Radio Sales & Serv., Inc.*, 727 P.2d 419, 425 (Haw. Ct. App. 1986) ("Defendants [debtors] were entitled to prove any damages they suffered as a result of the failure to notify them of the sale."). Thus, we must determine if Plaintiffs have established the fair market value of the equipment exceeded the purchase price.[7] *See In re Cummings*, 147 B.R. 738, 745 (Bankr.D.S.D. 1992) (dismissing debtor's claim because he "failed to present any evidence of the damages he suffered by [the secured party's] alleged failure to sell secured property in compliance with the Uniform Commercial Code"); *Mercantile Fin. Corp.*, 292 F. Supp. at 801.

Plaintiffs submitted a price list for excavators and insist that we should value the excavator at $67,666.66, that price being the average price of three 1998 PC 200 six year old excavators with accessories listed on the price list. (Ex. 22.) There are immediately numerous problems with this approach. First, we have no evidence that the 1998 PC 200 and 1995 PC 200 are equivalent models. For example, car manufactures often change their models from one year to the next, different styles being worth much different prices. Second, evidence was introduced that CSS's excavator had a significant number of hours on it, maybe even close to 8000 hours of use. No machine on the provided list has a comparable amount of hours, nor were we provided with information as to how the number of hours on a machine (or the condition of the machine) may depreciate its value. Third, the price list contains excavators and lists some included attachments. How are we supposed to know if the attachments in the price list mirror the attachments at issue in this case? Certainly, the type of attachments the equipment comes with can affect its value. These are just some of the problems we have with Plaintiffs' damages figure.

We believe a fairer assessment is to look at CSS's disposition of the rock

---

[7] Much of the case law in this area involves the secured creditor trying to recover a deficiency judgment after the sale of the collateral. There is less case law discussing the situation where a debtor alleges that the collateral was worth not only more then it was sold for, but more then the amount of the debt.

breaker and determine how much it depreciated at the time of sale. CSS purchased the rock breaker new in 1998 for $16,240.00. In 2002, it gave the rock breaker to Vailu'u & Sons to settle a $10,155.00 debt. This represents a depreciation to 62.53 percent. CSS purchased the excavator and the other equipment (including the rock breaker) for $77,672.13 in 1998. Using the 62.53 percent figure, we find fair market value of this equipment to be $48,568.38 at the time it was sold to Sila. In addition to the $30,943.00 loan, Sila made payments of $8,867.67 and $1,668.00 for the equipment. Thus, Sila paid $41,478.67 in connection with the excavator. The difference between this price and the fair market value is $7,089.71. BOH is liable to CSS for this amount.

## C. Breach of Duty to Account

Plaintiffs argue that BOH breached its duty to account after the disposition of the equipment. On January 29, 2002, Plaintiffs, through their attorney, requested BOH provide an accounting for the disposition of the collateral that secured their loan. (Ex. 7.) In this letter, Plaintiffs claim they previously requested this information in writing on October 1, 2001 and received an insufficient response. (*Id.*). BOH responded to Plaintiffs' January 29 request on February 1 and 19, 2002. (Ex. 8 and 9.) Plaintiffs argue that BOH's response was inadequate.

Even assuming BOH had a duty to account to the Plaintiffs, Plaintiffs have not established that BOH's failure to provide the accounting caused them any damages. As such, we find in favor of BOH on this claim.[8]

## D. Conversion of Sallie's Funds

Sallie alleges that BOH wrongfully set off money from a checking account she jointly owned with her husband. The right of setoff is "an ancient doctrine tracing its origin back to the Roman doctrine of 'compensatio,' which is the extinction of cross-demands." *Four Circle Co-op v. Kansas St. Bank & Trust Co.,* 771 F. Supp. 1144, 1149 (D. Kan. 1991). This right "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf,* 116 S.Ct. 286, 289 (1995) (citations omitted); *see also American Samoa Gov't Employees Fed. Credit Union v. Sele,* 28

---

[8] Under Hawaii Revised Statutes section 490:9-625(f), Plaintiffs may have been entitled to recover the $500 statutory award. However, American Samoa has not adopted the UCC, nor does it have any statutory damage award to compensate Plaintiffs for this claim. In the absence of any showing of damages by Plaintiffs, we believe a damage award is inappropriate in this case.

A.S.R.2d 21, 24 (Trial Div. 1995).

 The right to setoff usually exists when four conditions are met:

(1) the funds to be setoff are property of the debtor; (2) the funds are deposited without restrictions; (3) the existing indebtedness is due and owing; and (4) there is mutuality of obligation.

Paul Laurino, *Whose Money is It Anyway? A Bank's Right to Setoff Against Joint Accounts,* 1996 COLUM. BUS. L. REV. 61, 63. In determining a bank's right to setoff from a joint account, modern courts usually first turn to state statutes regulating bank accounts or the provisions in the account agreement. *Id.* at 64. "It is universally recognized that a bank may contract with customers for the right to setoff from the entire joint account the debt of only one of the joint account holders." *Id.* at 65. In the absence of an agreement between the parties, courts look to state statutes. Some states have adopted statutes regulating setoff or other aspects of joint bank accounts. *Id.* at 70-72, 81 ("Presently, the majority of states permit banks the statutory right to setoff only a debtor's net contribution to the account, or in absence of evidence thereof, the debtor's pro rata share of the account.").

 In the Continuing Guaranty, Moru agreed BOH could use the setoff process against his checking or savings accounts. (*See* Ex. 39 ¶ 15.) However, BOH offers no contractual agreement to demonstrate that it was allowed to set off funds from Sallie and Moru's *joint* account.[9] Moreover, American Samoa does not have statutes regarding the right to setoff or the regulation of joint accounts.[10] Because we do not have statutes or an account agreement to turn to for guidance, we must look to the common law.

At common law, a bank typically had to concede a lack of mutuality when at least one of the holders of a joint account did not have a debt with the bank. Thus, the bank would try to

---

[9] In its written closing argument, Bank of Hawaii also argues that it was entitled to set off funds from the Sallie and Moru's account because Tasi Scanlon testified that Moru Mane separately gave them permission to set off the loan payments at issue, and because Moru did not explicitly deny this at trial. However, no evidence demonstrated that Sallie Mane gave her permission for the setoff.

[10] According to paragraph 12 of the Continuing Guaranty, the "Guaranty shall be construed in accordance with the laws of the State of Hawaii." (Ex. 39.) However, neither party provided any discussion of Hawaii law regarding this issue. Hawaii Revised Statutes Annotated section 412:4-105 discusses joint accounts but does not explicitly address the setoff issue.

argue that the debtor was indeed the actual owner of the account's funds and that the other joint "owner" had made no contribution at all. If the argument was convincingly made, a court would allow the bank equitable setoff of the funds.

Paul Laurino, 1996 COLUM. BUS. L. REV. at 64 (footnotes omitted). In *Greenwood v. Bank of Illmo*, 782 S.W.2d 783 (Mo. Ct. App. 1989), the court noted that "[o]ut-state authorities hold that, in the absence of a statute or a specific agreement between joint depositors and the bank conferring upon the bank a right to set off the individual indebtedness of one of the depositors against the bank's liability on the joint account, the bank's set off may not exceed the interest of the indebted depositor in the joint account." *Id.* at 786 (collecting cases); *see also Symanski v. First Nat'l Bank of Danville*, 609 N.E.2d 989, 993 (Ill. App. Ct. 1993) ("A bank has a right of setoff, as against a deposit, only when the individual who is both depositor and debtor stands in both of these characters alike, in precisely the same relation and on precisely the same footing toward the bank."); *Colella v. N. Easton Sav. Bank*, No. Civ. A. 95-00362, 1995 WL 670140 *5 (Mass. Super. Ct. Sept. 11, 1995) (denying bank's motion for summary judgment because actual ownership of the funds in joint account was question of fact and bank was only entitled to setoff from funds owned by debtor); 10 AM. JUR. 2D *Banks and Financial Institutions* § 878 (1997) ("[A] bank has no right to set off against a deposit in the names of two persons . . . save to the extent to which its debtor is shown to be the actual owner of the moneys deposited, even though the bank accepted the deposit without knowledge as to the actual ownership of the money."). We hold that Bank of Hawaii was entitled to setoff funds from the Manes' joint account to the extent those funds belonged to Manu.

However, Sallie seeks damages for the entire amount set off from the joint account. If Sallie thought the entire setoff was inappropriate, she should have made a showing that all of the funds belonged to her. In determining which party should bear the burden in wrongful setoff cases, one commentator noted, "[t]he answer is usually that the burden is on the account holder." Paul Laurino, 1996 COLUM. BUS. L. REV. at 81. He claims this "is the only practical solution because a bank is privy only to imperfect information regarding ownership of funds." *Id.*

Absent any evidence from either side to the contrary, we presume that ownership in the Manes' joint account was equal, which gave Bank of Hawaii the right to set off one half of the Manes' joint account. The setoff of more than one half of the account was wrongful. "Where a bank breaches its deposit contract with a depositor by wrongfully exercising a setoff, the depositor is entitled to recover the full amount of the offset." 10 AM. JUR. 2D *Banks and Financial Institutions* § 873. On April 10, 2001, the joint account had a balance of $4,068.55. BOH

203

exercised its right to set off on April 11, 2001. Accordingly, at this time, BOH was entitled to setoff $2,034.28, representing one half of the amount in the joint account. BOH wrongfully set off an additional $1,666.27 from the Manes' joint account. This setoff caused several of Sallie's checks to be returned and caused her to incur vendor fees. We believe BOH is also responsible for these charges. According to the BOH statements and Sallie's chart, she incurred returned check fees of $294.00 and vendor charges of $400.00. In total, BOH shall reimburse Sallie Mane $2,360.27. (Ex. 17, 18, 43, 44.)

## II. Plaintiffs v. Tony's Construction

### A. Conversion

Sila purchased the excavator from BOH. Sila was legally entitled to take possession of the excavator and the attachments since he purchased them. As such, Tony's Construction is not liable on this claim.

### B. Intentional Infliction of Emotional Distress

Plaintiffs allege that Tony's Construction caused them "extreme emotional distress" by its wrongful acquisition of the excavator. We previously granted summary judgment to Sila and BOH on similar claims.

■ For the same reasons we discussed in our January 28, 2004 orders granting partial summary judgment, we find that the alleged conduct falls short of what is required for a claim of intentional infliction of emotional distress ("IIED"). In an IIED case, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability." RESTATEMENT (SECOND) OF TORTS § 46 (1965). Tony's Construction's acquisition of the excavator after BOH's repossession was not extreme or outrageous conduct. Moreover, Plaintiffs have offered no evidence that Tony's Construction intended to cause them emotional distress by acquiring the excavator.

## III. Plaintiffs v. Sila Poasa

### A. Conversion

Sila purchased the excavator from BOH. Sila was legally entitled to take possession of the excavator and the attachments since he purchased them. As such, Sila is not liable on this claim.

## B. Trespass

Plaintiffs seek damages for trespass from Sila arguing that employees of Tony's Construction along with police officers entered and searched their property. However, at trial, Plaintiffs offered little or no evidence to support this allegation. Absent a sufficient showing by Plaintiffs, we find in favor of Sila on this claim.

## IV. Tony's Construction and Sila Poasa v. Moru Mane, et al.

### A. Replevin

Tony's Construction and Sila Poasa argue that as part of the agreement with BOH, they purchased a rock breaker, which was being wrongfully withheld by CSS and the Manes. On September 10, 2001, BOH approved Sila and Falesa Poasa's financing request and noted that the rock breaker was not repossessed by BOH and that Sila would have to repossess it on his own. (Ex. 37.) Indeed, when BOH attempted to repossess the rock breaker, Moru represented that it had been stolen at a job CSS did in Poloa. BOH was, therefore, never able to acquire the rock breaker.[11] (Ex. 34.) Later, when Sila and Tony's Construction brought their counterclaim for replevin, Plaintiffs admitted that they had possession of a rock breaker. During trial, testimony demonstrated that Moru gave the rock breaker to Vailu'u and Sons Trucking in order to satisfy a $10,155.00 outstanding debt.

 "Replevin is a proceeding by which the owner or one who has a general or special property in the chattel taken or detained seeks to recover possession . . . ." 66 AM. JUR. 2D *Replevin* § 2 (1973) (footnote omitted). Ordinarily, in an action for replevin, the defendant must have possession of the property. *See, e.g., Relational Funding Corp. v. Advantage Sch., Inc.*, No. 02 C 1242, 2002 WL 1303134 *9 (N.D. Ill. June 13, 2002). Indeed, at the time Sila and Tony's Construction brought the counterclaim, CSS and Moru were in possession of the rock breaker. In any event,

> there are many holdings to the effect that the replevin action is maintainable where the defendant's transfer of possession was wrongful, particularly where it has been made for the purpose

---

[11] BOH was still entitled to sell the rock breaker to Sila. *See, e.g., Buran Equip. Co. v. H & C Inv. Co.*, 142 Cal. App. 3d 338, 342 (Cal. Ct. App. 1983) ("[S]ale may occur before repossession of the collateral. In modern day commercial transactions, often involving large equipment as the security, it would not be unusual for the equipment to be located in diverse geographical locations.") (citations omitted).

of evading the action … [I]t has been pointed out that permitting the defendant to set up as a defense to the action the fact that he has parted with the possession of the property, when this was done wrongfully, would be allowing him to take advantage of his own wrong. It would enable one who had wrongfully taken or detained property from the owner to refuse to deliver, and hold to the last moment before the writ, and then evade a suit by a transfer of possession. His successor might do the same; and his after him; and so on, until the cost of successive writs would exceed the value of the property.

66 AM. JUR. 2D *Replevin* § 27 (footnotes omitted); *see also B.P. Rozen v. Redco Corp.*, 362 P.2d 1095, 1096-97 (Okla. 1961); *Black v. City of Cleveland*, 387 N.E.2d 1388, 1391 (Ohio App. Ct. 1978).

CSS and Moru deceived BOH by telling it the rock breaker was missing when they actually were in possession of it.[12] After Sila made it clear that he believed he had legal title and that he wanted possession of the rock breaker, Moru and CSS used it to satisfy another debt. Accordingly, we cannot order Moru or CSS to return the rock breaker because they no longer have actual or constructive possession of it. However, we can award Sila an alternative money judgment representing the value of the property. There is authority "indicating that evidence as to the purchase price may be considered in determining the value of the replevied property for the purposes of such an alternative money judgment." *66 AM. JUR. 2D, Replevin* § 123. Moru and CSS gave the rock breaker to Vailu'u and Sons Trucking in order to satisfy a $10,155.00 debt. Therefore, the value of the rock breaker is assessed at $10,155.00.

## V. Tony's Construction and Sila Poasa v. BOH

Sila and Tony's Construction brought several crossclaims against BOH: (1) breach of warranty of good title; (2) fraud and misrepresentation; (3) negligence; and (4) indemnity. All of these claims were dependant on our finding that BOH improperly sold or converted the excavator or that Sila had to return the excavator to CSS. Since we found that BOH privately sold the excavator to Sila and that Sila properly has legal title,

---

[12] We note under A.S.C.A. § 46.4128, "[a] person commits the crime of defrauding secured creditors, [a Class D Felony punishable by a term of imprisonment of up to five years where the value of the outstanding debt exceeds the sum of $500], if he destroys, removes, conceals, encumbers, transfers, or otherwise deals with property subject to a security interest with purpose to defraud the holder of the security interest."

these claims are no longer at issue. Accordingly, Sila and Tony's Construction's crossclaims against BOH are denied.

## Conclusion & Order

1. BOH is liable to CSS for $7,089.71 representing the difference between the fair market value of the equipment and the sale price to Sila Poasa.

2. BOH is liable to Sallie Mane for the wrongful setoff of money in her joint checking account in the amount of $2,360.27.

3. Plaintiffs' other claims against BOH are denied.

4. Plaintiffs' claims against Sila and Tony's Construction are denied.

5. Sila and Tony's Construction's counterclaim for replevin is granted. CSS and Moru are liable to Sila for $10,155.00.

6. Sila and Tony's Construction's crossclaims against BOH are denied.

Judgment will enter accordingly.

It is so ordered.